**DWIGHT & LLOYD SINTERING CO., Inc., v. GREENAWALT (AMERICAN ORE RECLAMATION CO., Intervener).**

District Court, S. D. New York. April 18, 1927.

**1. Patents ⊜═289(4)—Delay without valid excuse of from 9 to 13 years held laches, which barred suit for infringements.**

Delay without valid excuse for from 9 to 13 years before bringing suit for infringement of patents against a defendant, whose use of the alleged infringing device by himself and licensees was extensive and well known, *held* such laches as to bar right to maintain the suit.

**2. Patents ⊜═328—1,254,316, for ore-treating process, held not infringed.**

Dwight patent, No. 1,254,316, for process of treating ores, *held* not infringed.

**3. Patents ⊜═289(4)—Suit for infringement of patents on divisional applications, filed more than two years after alleged infringing device had been reduced to practice, held barred by laches.**

A patentee *held* barred by laches and estoppel from maintaining suit for infringement of patents issued on divisional applications not filed until more than two years after defendant, with patentee's knowledge, had reduced the alleged infringing device to commercial practice.

**4. Patents ⊜═328—1,348,407, for ore-treating apparatus, held not infringed.**

Greenawalt patent, No. 1,348,407, for apparatus for sintering ores, *held* not infringed.

In Equity. Suit by the Dwight & Lloyd Sintering Company, Inc., against John E. Greenawalt, with the American Ore Reclamation Company intervening. Decree dismissing bill and counterclaim.

Suit for infringement of the following patents, of which the following claims are in suit:

Dwight & Lloyd patent, No. 882,517, for a process of treating ores, issued March 17, 1908, claims 3, 6, 12, 13, 14, and 16.

Dwight & Lloyd patent, No. 1,020,345, upon a metalliferous ore product, issued March 12, 1912, claim 2.

Weeks reissue patent, No. 13,758, upon apparatus for calcining, desulphurizing, agglomerating, and sintering ores and like materials, originally issued March 30, 1909, reissued June 23, 1914, upon application for reissue filed August 9, 1910, claims 1, 2, 16, 20, 25, 30, and 35.

Dwight patent, No. 1,102,982, upon apparatus for roasting and sintering ores, issued July 7, 1914, claims 3 and 4.

Dwight patent, No. 1,254,316, for process of treating ores, issued January 22, 1918, claims 1, 4, 6, and 8.

Dwight patents, No. 1,433,349 (claims 1, 2, and 3), 1,433,350 (claims 8, 9, and 10), 1,433,351 (claims 4 and 7), 1,433,352 (claims 1, 5, 8, and 9), all issued October 24, 1922.

The answer sets up a counterclaim for infringement of Greenawalt's patents, 1,348,407 and 1,348,408, issued August 3, 1920. The latter patent has, however, been withdrawn from consideration, and the claims of patent 1,348,407 in suit are 13, 21, 48, and 49.

George H. Gilman, of Hartford, Conn. (Thomas Ewing, Albert M. Austin, and Otto C. Wierum, all of New York City, of counsel), for plaintiff.

Fish, Richardson & Neave, of New York City (Charles Neave and Clarence D. Kerr, both of New York City, and Harry A. Beimes, of St. Louis, Mo., of counsel), for defendant.

Hardy, Stancliffe & Whitaker, of New York City (John L. Jackson, of Chicago, Ill., of counsel), for intervener.

THACHER, District Judge (after stating the facts as above). The patents in suit relate to "sintering" of fine ores; that is, their treatment with heat, by which they are agglomerated into cohesive porous masses, suitable for reduction in a blast furnace. The Huntington and Haberlein process patent, No. 786,814 (April 11, 1905), was the best method of sintering prior to Dwight & Lloyd patent, No. 882,517 (March 17, 1908). This process was capable of producing some sintered material, but in the mass the product was unsatisfactory in composition and costly to handle. It was produced in great pots, in which tons of ore mixed with lime were burned under draft forced upward through the material. Under these conditions a uniform product could not be produced. The lower portions of the charge, owing to the pressure imposed by the weight of the superimposed material, were reduced to a nonporous slag, while in the upper portions of the charge large quantities of fines remained unsintered, owing to the agitation of the ore particles, caused by the upward rushing currents of air. The unsintered material required retreatment, and the large masses of nonporous, thoroughly fused material could not be used in the blast furnace until broken up, at large expense, and even then were unsatisfactory, because of their physical and chemical structure.

This clumsy pot-roasting process does not bear comparison with the process disclosed by Dwight & Lloyd, in their patent No. 882,517, issued March 17, 1908. The process de-

scribed in this patent eliminates the varying degrees of pressure throughout the mass, and maintains the ore particles in a state of quiescence during combustion. The means by which this is accomplished are simple, but effective. Pressures throughout the mass are avoided by treating the ore in a thin layer. Quiescence of the particles during combustion is attained, either by employing a down draft with ignition at the top surface, in which case the agitation of the particles is restrained by the vessel in which they are contained and the pressure of the downward draft, or, if an up draft is used, by employing a screen to maintain the quiescence of the particles near the top surface. In porosity, friability, and chemical structure the sintered product of Dwight & Lloyd is quite ideal for treatment in a blast furnace, and their process is superior to any method of the prior art for preparing fine ores for treatment in a blast furnace.

[1] A defense of laches and estoppel is most earnestly pressed, particularly with reference to the earlier patents in suit. This defense may be considered at the outset with reference to the first four patents in suit, the latest of which was issued in July, 1914, and solely for the purpose of this consideration the validity and infringement of these patents may be assumed.

Prior to 1910, Greenawalt, who was a metallurgist of considerable experience, was engaged in the study of processes for the desulphurization of sulphide ores. In the course of his work he found the use of a porous hearth, upon which the ore was roasted under a down draft of air, resulted in efficient desulphurization, and that the down draft could be utilized in saving volatile elements of value in the products of combustion, ordinarily carried off through the furnace stack. He had noted the sintering effect of this process upon the ores under treatment, but it was not his purpose to produce sinter, and in the development of roasting processes his effort was to prevent sintering, which impeded complete desulphurization. For this purpose, in his two down draft patents, Nos. 839,064 and 839,065 (December 18, 1906), he employed rabbles. In 1908 Dwight & Lloyd installed sintering apparatus at the plant of the Ohio & Colorado Smelting Company, at Salida, Colo. This apparatus was a continuous type of machine, in which the bed of ore was constantly moved under an igniter and across suction chambers, which maintained a down draft during the process of sintering; the sintered product being automatically dumped by the ma-

chine after the material had been ignited, moved across the suction chambers, and sintered. Early in 1909 Greenawalt visited this plant. At that time he was familiar with the Dwight & Lloyd patents. Shortly thereafter he concluded negotiations with the Modern Smelting & Refining Company for the installation of intermittent sintering apparatus at Denver, Colo. This machine consisted of a pan mounted upon trunnions, in which the material was sintered, down draft being maintained by a suction chamber in the pan beneath the bed upon which the ore was sintered. The sintered product was dumped by turning the pan upon its trunnions, when it was recharged and the process repeated. This apparatus was installed for sintering blast furnace flue dust. It was Greenawalt's first commercial sintering operation. From then until the present time he has been actively engaged in licensing under his own patents apparatus of this type for sintering fine ores. Since 1910 his apparatus has been used extensively in the treatment of sulphide ores, and since 1912 in the treatment of ferrous ores. The fact that his licensees have paid him large royalties and have made very substantial investments upon the faith of his patents is persuasive of the fact that his claim of right to use his own device was not entirely devoid of merit. With all of his operations the plaintiff has been quite familiar. His competition was by no means negligible, and the plaintiff was thoroughly aware of it. In 1911 two of his licensees were threatened with suit, but from that time until the commencement of this suit, in October, 1923, no objection was made by the plaintiff that he was infringing any of the four patents referred to in the last paragraph.

It may well be that mere delay in the enforcement of patent rights, even to the extent indicated by this record, will not preclude suit for infringement against a deliberate infringer, who without color or claim of right willfully and knowingly infringes. Clearly this is not such a case. Before Greenawalt constructed his sintering plant in Denver, he showed his plans to Weeks, who was employed by one of the plaintiff's licensees and is the patentee of one of the patents in suit. At about the same time he wrote a letter to the plaintiff, stating that he had no quarrel with their patents, provided a porous bed between the grate and the material being treated was not used. At this time he was planning the installation of his sintering pan at the Denver plant, and I can only reconcile his acts with honest belief upon his part that

the Dwight & Lloyd patents were not sufficiently broad to cover the use for sintering purposes of the apparatus which he was then planning to install at Denver, and which, with improvements, he has ever since been licensing to others under his own patents, 839,064 and 839,065.

Assuming infringement, I am entirely satisfied that Greenawalt honestly believed he was not infringing. This belief was confirmed and encouraged by the plaintiff's acquiescence, with full knowledge and without objection, in all that he did.

Under the circumstances, I think it clear that the defense of laches must be sustained, in so far as the first four patents in suit are concerned. The case of Frank F. Smith Hdwe. Co. v. S. H. Pomeroy Co., 299 F. 544 (C. C. A. 2d), much relied upon by plaintiff, involved fraudulent and deliberate infringement. There was no evidence in that case justifying belief by the defendant that it would be free from suit for infringement. The defendant actively participated in litigation between the plaintiff and another infringer during a long series of years, and was therefore cognizant at all times of the plaintiff's insistence upon its rights under the patent in suit. Furthermore, there were extraordinary circumstances excusing the plaintiff's delay in instituting suit. The case at bar, in my opinion, is governed by Richardson v. Osborne (C. C. A.) 93 F. 828; Westinghouse v. N. Y. Air Brake Co. (C. C.) 111 F. 741; Window Glass Machine Co. v. Pittsburgh Plate Glass Co. (C. C. A.) 284 F. 645; Kelley v. Boettcher (C. C. A.) 85 F. 55.

The circumstances relied upon by the plaintiff to excuse delay upon its part clearly do not furnish legal excuse for laches in this case. It is said that from October, 1912, until June, 1919, the parties were engaged in interference proceedings in the Patent Office; that during the war the plaintiff's staff was largely depleted because of active military service; that after the war the plaintiff's patent counsel, because of illness, was unable to give attention to the plaintiff's affairs; and that the present suit was begun as soon as new patent counsel could be retained. I am unable to see why the pendency of interference proceedings in the Patent Office should excuse the prosecution of claims upon patents already issued. This is not the case of an inventor without means to enforce his rights. The position of the plaintiff in basic industries of this country is one of enviable importance, and the fact is clear that it was under no disability at any time

which prevented the vigorous enforcement of its rights.

The excuse offered for delay is little more than assertion of inconvenience, and is not sufficient to excuse acquiescence of from 9 to 13 years, which has encouraged and confirmed the defendant in an honest, if mistaken, belief that his acts were not an infringement of the plaintiff's rights. For these reasons, relief must be denied in so far as the Dwight & Lloyd process patent, 882,517, the Dwight & Lloyd product patent, 1,020,345, the Weeks reissue patent, 13,758, and the Dwight appliance patent, 1,102,982, are concerned.

[2] The fifth patent in suit is the Dwight patent, No. 1,254,316, dated January 22, 1918. It has been referred to as the "iron patent," because it is said to disclose an adaptation of the sintering processes disclosed by Dwight & Lloyd patents, 882,517 and 882,518, to the treatment of "iron oxide ores," and other ores of like character, which do not contain combustible elements, such as sulphur or its equivalent, in sufficient quantities. After describing the processes disclosed in these prior patents, Dwight, in his specification in patent No. 1,254,316, describes his invention as follows:

"But when I undertook to agglomerate or sinter finely divided or pulverulent ores of these other classes, to wit, those of the oxide class, or their equivalents, different conditions were met, and peculiar difficulties were experienced by me. I found that the agglomerating of the fine particles of the oxide ores must depend upon activities other than those which I found to be efficient in operating on the materials of the sulphide class, and that the cementing or binding of these particles must be secured by different causes.

"I found, particularly, that the silicating, or the like, of the basic materials should not be depended on, and, in fact, should be avoided as far as possible. I further discovered that, in order to prevent the temperature from being raised to the point of silicification, the oxide ore should be arranged in a relatively thin layer, so that the heat, after performing the necessary work, would readily escape by conduction through short paths and by radiation.

"In place of the sulphur I employ carbonaceous material in pulverulent form, which is intimately and uniformly commingled with the ore oxide. This is ignited at the exposed surface, and the combustion is carried through the mass by currents of combustion gas, such as the oxygen of the atmosphere. The carbon oxides peculiarly interact with the metal oxide and by prop-

erly controlling and regulating the different materials I am able to effect a binding of the particles together, not so much by an action like that of silicating a base material as by causing the union of one form of metal oxide with another, the oxides passing from one form to another in the presence and under the influence of the carbon oxides."

The teaching of the patent is that oxide ores can be sintered without silicification by adding as a combustible element carbonaceous material in pulverulent form, treating the material in relatively thin layers, and controlling the chemical reactions of the metal oxides in the presence and under the influence of the carbon oxides, so as to produce sintering without raising the temperature to the point of silicification. In illustration of this process it is said:

"It is believed that the general nature and scope of my improved process will be apparent from the foregoing description of the construction and operation of the apparatus selected for purposes of illustration. However, it may be well to point out in detail the actions incident to the various steps of the process, references being had more particularly to the use of an oxide iron ore and a carbonaceous material such as powdered coal or coke. For illustration, I will assume that the metal body to be treated is the above-mentioned magnitite iron ore.

"The iron oxide, after having been mixed with a proper quantity of powdered coal or coke, and with a flux, if desired, is deposited upon the moving grate of the sintering machine, and the coal or coke is ignited at the top surface in the manner which has been described. Air is drawn downward through the interstices of the mixture, and causes the combustion of the coal or coke to progress downward and inward through the mass. The action which takes place is in some respects similar to the action which takes place in a blast furnace. The carbon in burning generates, of course, the ordinary carbon oxides. The plane of combustion proceeds from the surface toward and through the interior.

"The atmospheric oxygen is supplied more slowly the farther the air travels inward, and there tends to be a correspondingly large amount of carbon monoxide generated; but this, in turn, as more oxygen is taken up by it, passes into the dioxide form; and the mass of metalliferous particles are enveloped in these carbon oxides. The temperature which is generated raises that of the iron oxides to the points where reactions can occur. The magnetite, in the presence of the carbon oxides, manifests the tendency, largely from contact reaction, to adhere to neighboring particles, either those of its own constitution or those of other compositions. It is an instance of the phenomenon analogous to cementation of certain forms of iron. There is, also, a tendency for it, under certain conditions, to pass into other lower oxide forms, and the lower and the higher oxides, in the presence of the carbon oxides, unite again to form a ferrite.

"The temperature at which this occurs (from 600 deg. to 800 deg. C.) is much lower than that at which silicification occurs. If in the reactions between the metal oxides and the carbon oxides any metallic iron is temporarily released, the particles of such metal tend to unite and assist in establishing the coherency of the mass. If, instead of the iron oxide ore being largely magnetite, it is of the lower oxide form, namely, hematite; as soon as it is heated and enveloped in the bodies of carbon oxides, more or less of it takes on more oxygen and becomes relatively acid in character, and this part in turn unites with the lower oxide and produces a ferrite, which, at the time of nascency, and as above described, produces a cohering analogous to cementation and at a temperature much lower than that at which the silicating of the iron occurs.

"I am aware of the fact that it has been heretofore proposed to mix carbonaceous material with iron ores and then place the mixture in a large pot or converter, and with a powerful blast attempt to force air through it for the purpose of agglomerating it. But, so far as I have been able to learn, no success was attained and all such attempts have been abandoned."

The disclosure of this patent is necessarily limited by the original process patent, No. 882,517, and by the practice, well known in the art, of mixing coal or other suitable fuels with ores lacking in combustible elements sufficient to support combustion. Reading the specifications of the iron process patent with these limitations, it is readily seen that the invention claimed is the method or process by which ferrous ores can be sintered at temperatures below those at which silicification occurs. In a word, Dwight lowers the sintering point below the silicification point, and thus produces a ferrite sinter substantially free from silicates. This the patent teaches is accomplished by controlling temperatures, first, by heating the ore in a thin layer in which combustion will be comparatively brief; and, second, by controlling chemical reactions of carbon

oxides and metal oxides in combustion, so as to produce ferrite in sintered form in temperatures of 600 deg. to 800 deg. C., which are below the silicification point.

Claims 1 and 6 of this patent are limited accordingly—claim 1, to a process in which the metalliferous particles are caused "to unite and cohere" (i. e., to be sintered) "at a temperature below that of silicification of the metal"; and claim 6 to a process in which the temperature of ignition and reaction is maintained "at points below the formation of iron silicates." Claims 4 and 8, the only other claims in suit, are not thus expressly limited; but, if valid, they must be within the disclosure, which in terms and by virtue of the prior art is limited to a process in which sintering is accomplished at temperatures below the point of silicification.

Without considering the validity of these claims, it is enough to say that it is not shown that the Greenawalt licensees sinter their material at temperatures below the silicification point. Greenawalt's ore bed is much deeper than is customary in the Dwight process, and, while his licensees avoid an excess of carbon, the temperatures which they employ are much higher than those indicated by Dwight, and are substantially above the silicification point. Greenawalt testified that he has never attempted to control temperatures through the amount of fuel used, and that when too little fuel is used he regards the sintered product as unsatisfactory, because too brittle. While the testimony is not entirely satisfactory, the preponderance indicates that his product contains substantial quantities of iron silicate. Under these circumstances, it must be held that, assuming the claims to be valid, their infringement has not been shown.

[3] The four remaining patents in suit, exclusive of the counterclaim, were all issued to Dwight October 24, 1922, and are all divisions of an original application filed December 23, 1907, almost 15 years before these patents issued. The original application describes the invention as one which relates to improvements in apparatus for treating ores, it being particularly intended for desulphurizing and sintering ores of the sulphide class; the object of the invention being to provide a mechanism for this purpose of simply constructed elements. The original drawings and specifications disclose a mechanism in which a series of pallets or cars, moving upon wheels and each carrying a grate, are moved under a hopper from which the grates are filled with ore, then under an igniter by which the surface of the ore on each grate is ignited, and then over a suction box by means of which internal combustion is supported under downward draft until the process of sintering is complete. The mechanism is designed so that, when the cars have passed over the suction box, the sintered product is dumped and the cars are returned to the hopper, to be refilled and the process repeated. A modified form of construction, in which an air forcing chamber is used in place of a suction box, is also described.

In the original patent drawings several means for igniting the ore mass are illustrated, but the applicant makes it clear that he does not limit his invention to any particular means of ore ignition, but merely illustrates a few of a variety of ways in which ignition may be accomplished. Ten different methods are described and illustrated, but no claims were inserted in the original application covering any of these ignition means, until February 21, 1910, more than two years after the original application was filed, and after the Greenawalt sintering plant had been constructed and was in operation at Denver, Colo. The claims then proposed were all limited to an igniter, consisting of a noncombustible body and means for heating such body to a temperature sufficient to cause the ore in proximity thereto to be ignited—in other words, to a device which effects ignition by means of radiation. These claims were so drawn as not to cover Greenawalt's igniting mechanism, in which the ore is ignited through direct contact with flaming gas or oil. On March 1, 1910, amendment was disallowed on the ground that these claims covered an invention distinct from that covered by the other claims. On September 22, 1910, the applicant accordingly canceled, but expressly reserved the right to present the claims in a divisional application.

Before allowance of the original application, a divisional application was filed on February 4, 1910, upon which the patent in suit, No. 1,433,350, eventually issued. On October 24, 1911, the original application was allowed, but was not finally issued until May 21, 1912. In the meantime a divisional application was filed, March 14, 1912, upon a subsequent division of which the patent in suit, No. 1,433,352, issued, and on March 25, 1912, another divisional application was filed, upon which the patents in suit, Nos. 1,433,349 and 1,433,351, eventually issued, the latter upon a subsequent division.

It will be convenient to consider these divisional applications in their order of fil-

ing; the earliest being that upon which patent No. 1,433,350 eventually issued. Of this patent the claims in suit are claims 8, 9, and 10. None of these claims appear in the original divisional application of February 4, 1910, and were not proposed until after allowance of the application, on May 26, 1911, its forfeiture for failure to pay the final fee, and its renewal on April 23, 1912, when for the first time claims 8 and 9 were proposed. Claim 10 was not · proposed until July 18, 1912. In the meantime Greenawalt had reduced his method of ignition, here charged as infringement, to commercial practice in January, 1910, over two years before these claims were proposed.

The next divisional application is that of March 14, 1912, pursuant to which patent No. 1,433,352 eventually issued, October 24, 1922, upon subsequent divisional application filed May 8, 1912. The claims of this patent which are in suit are claims 1, 5, 8, and 9. None of them appear prior to the division of March 14, 1912. It follows that these claims were not proposed until over two years after Greenawalt's commercial practice, in January, 1910.

The next divisional application is that of March 25, 1912, pursuant to which patents Nos. 1,433,349 and 1,433,351 eventually issued, October 24, 1922, the latter upon redivision. The claims of patent No. 1,433,-349 which are in suit are claims 1, 2, and 3. They were inserted March 25, 1912, on the original division, and were substantially amended July 16, 1912. The claims of patent No. 1,433,351 which are in suit are claims 4 and 7. Claim 4 appears in the divisional application of March 25, 1912. Claim 7 was suggested April 14, 1913, for interference with Greenawalt.

From this record it appears that none of the ignition claims in suit were proposed until over two years after the defendant's method of ignition, here charged as infringement, had been known to the plaintiff and had been reduced to commercial practice. I find no excuse for the delays which have characterized these proceedings in the Patent Office, commencing with the original application of December 23, 1907, claimed as an effective filing date for these claims first proposed in 1912, and upon which patents did not issue until October 24, 1922. Three years are accounted for by the pendency of interference proceedings, but interference did not arise until July, 1913, three years after Greenawalt had established his intervening rights.

In Webster Co. v. Splitdorf Co., 264 U.

S. 463, 44 S. Ct. 342, 68 L. Ed. 792, the Supreme Court of the United States declared "that in cases involving laches, equitable estoppel, or intervening private or public rights, the two-year time limit prima facie applies to divisional applications and can only be avoided by proof of special circumstances justifying a longer delay. In other words, we follow in that respect the analogy furnished by the patent reissue cases."

While it is clear that the rule is one of laches, and that circumstances may excuse delays exceeding two years in the presentation of divisional claims, this case discloses no such circumstances. On the contrary, the proceedings in the Patent Office disclose that the claims first proposed in February, 1910, were so narrowly limited as to have no relation to the defendant's igniting mechanism; that these claims were later expanded to the very limit of, if not indeed beyond, the original disclosure, so that they might perhaps be read upon the defendant's device, and thus be made the basis for the charge of infringement here asserted. The subject-matter is simple, and there is no reason why the claims should not have been proposed in the original application of 1907, if, as is claimed, they were conceived as invention at that time. In the prosecution of these patents the plaintiffs have chosen to stand by, knowing the defendant's commercial development, proposing new claims and expanding old ones, the importance of which was first suggested, not in the development of their own inventions, but, I have no doubt, by the success of the defendant's commercial enterprise, at the same time withholding their patents from issue as long as the proceedings might safely be delayed, so as to perpetuate their control for as many years as possible.

Upon careful study of the Patent Office proceedings I find no other explanation tenable, and as Hough, J., suggests in American Laundry Machinery Co. v. Prosperity Co. (C. C. A.) 295 F. 819, the only way of dealing justly with such a situation under existing statutes is by drastic imputation of laches and by establishing an estoppel. Comparison of the claims in suit with the disclosure of the original application leaves serious doubt as to whether they can be regarded as having been carved out of that application, although much ingenuity has been employed in the long process of their expansion, accompanied by radical changes in the specifications and drawings, to retain some basis for the assertion that the claims in suit in fact cover inventions disclosed in the original application. But this question need not

be here determined. It was passed without decision in the Webster Case, and relief was there denied solely upon the ground of laches. There is here presented a case of laches and estoppel very much more aggravated than that presented in the Webster Case, and I am constrained by that decision to deny relief with respect to the ignition claims.

[4] In its counterclaim the defendant alleges infringement of patent No. 1,348,407. This patent was in litigation in Greenawalt v. American Smelting & Refining Co. (D. C.) 3 F.(2d) 658. The decision in that case, holding the patent invalid because of anticipation by publication early in 1908 by the Peruvian government of Bulletin 61, describing certain ore-sintering apparatus in practical operation by the Cerro de Pasco Mining Company, and also holding the claims not infringed, has been affirmed by the Circuit Court of Appeals in the Ninth Circuit (Greenawalt v. American Smelting & Rfg. Co., 10 F.[2d] 98), but without considering the question of validity raised by the defense of anticipation. Whether or not the judgment in that suit is a bar to the counterclaim in this, the determination there made is entitled to great respect and should be regarded as authoritative in this court in the absence of clear conviction of error. Mast Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 S. Ct. 708, 44 L. Ed. 856. In the Circuit Court of Appeals the claims of this patent were held to be limited to an ignition hood, which is airtight with respect to, and which covers the whole of, the ore holder. In the interference proceedings between Dwight and Greenawalt it was held that Greenawalt was entitled only to claims thus limited, and this determination was affirmed by the Circuit Court of Appeals of the District of Columbia. Greenawalt v. Dwight, 49 App. D. C. 82, 258 F. 982.

I am entirely convinced of the correctness of the decision of the Circuit Court of Appeals for the Ninth Circuit in thus construing and limiting the claims of this patent. As thus construed and limited, it is clear that these claims are not infringed by any of the alleged infringing devices here complained of. None of these devices is shown to have any means by which an air and gas tight joint can be formed between the hood and the ore container, and in actual operation the hood is always positioned above the ore containers, which are constantly moving under the hood. The distance between the hood and the ore container is always appreciable, and there is no contact between the two. It follows that infringement of defendant's patent has not been shown.

A decree may be entered, dismissing the complaint and the counterclaim, with costs to the defendant.