April Productions, Inc., Respondent, v. G. Schirmer, Inc., Appellant.

Argued January 6, 1955; decided April 14, 1955.

*Arthur F. Driscoll, Edward C. Raftery, Paul D. O'Brien* and *Milton M. Rosenbloom* for appellant. I. A contract to pay royalties terminates for want of consideration when the license upon which it is based terminates. Any other contract should be clearly and unequivocally stated. (*Herzog* v. *Heyman,* 151 N. Y. 587; *Bottlers Seal Co.* v. *Rainey,* 225 N. Y. 369; *Pomeroy* v. *New York Hippodrome Corp.,* 197 App. Div. 114; *Marston* v. *Swett,* 82 N. Y. 526; *Tams-Witmark Music Lib.* v. *New Opera Co.,* 298 N. Y. 163.) II. Copyright renewal is a new grant. If the owner of the new grant is a different individual from the owner of the copyright for the original term, he takes free and clear of any contracts or licenses that attached to the first term and any contracts made by the owner of the first term. (*Fitch* v. *Shubert,* 20 F. Supp. 314; *Shapiro, Bernstein & Co.* v. *Bryan,* 27 F. Supp. 11; *Southern Music Pub. Co.* v. *Bibo-Lang, Inc.,* 10 F. Supp. 975; *White-Smith Music Pub. Co.* v. *Goff,* 187 F. 247; *Silverman* v. *Sunrise Pictures Corp.,* 273 F. 909; *Fox Film Corp.* v. *Knowles,* 261 U. S. 326.) III. A license granted under a copyright terminates with the expiration of the copyright term. (*Ricordi & Co.* v. *Paramount Pictures,* 189 F. 2d 469; *Fisher Co.* v. *Witmark & Sons,* 318 U. S. 643; *Rossiter* v. *Vogel,* 134 F. 2d 908; *Fitch* v. *Shubert,* 20 F. Supp. 314; *Scott Paper Co.* v. *Marcalus Co.,* 326 U. S. 249.) IV. The trial court was in error in failing to grant defendant's motion to send the case to the law side of the court for jury trial, and after trial the court was obligated to dismiss the complaint. (*Jackson* v. *Strong,* 222 N. Y. 149; *International Photo Recording Machines* v. *Microstat Corp.,* 269 App. Div. 485; *Nelson* v. *Schrank,* 273 App. Div. 72; *Abrams* v. *Maryland Cas. Co.,* 270 App. Div. 901.)

*Lionel S. Popkin, William Klein* and *Adolph Lund* for respondent. I. Defendant is obligated to make payments under the agreement of September 14, 1917, as long as it publishes and sells the music. (*Friedman* v. *Handelman,* 300 N. Y. 188; *April*

*Productions* v. *Harms, Inc.*, 165 Misc. 883, 254 App. Div. 728; *Tams-Witmark Music Lib.* v. *New Opera Co.*, 298 N. Y. 163.) II. Plaintiff was entitled to an accounting, viz., equitable relief. Moreover, the action was properly brought in equity to avoid multiplicity of actions. In any event, defendant did not claim that the action should have been brought at law, for six years after it was started. Defendant asked for reformation of the contract. Concededly, no question of fact was involved. (*Pearl* v. *Seventh Ave. Film Co.*, 262 N. Y. 605; *De Mille Co.* v. *Casey*, 121 Misc. 78; *Satterlee* v. *Kobbe*, 173 N. Y. 91; *Atlantic Metal Products* v. *Minskoff*, 267 App. Div. 1002; *Small* v. *Kronstat*, 175 Misc. 626; *Dobschiner* v. *Levy*, 179 Misc. 416.)

FULD, J. This appeal involves the construction of an agreement for the publication of musical compositions on a royalty basis. The agreement is not expressly limited in time, and the question posed for decision is whether the publisher's obligation to pay the stipulated royalties is for an indefinite and indefinable period — indeed, in perpetuity — or is related to, and measured by, the period for which the grantor controlled and granted the right to publish and sell copies of the work on which royalties were to be computed.

In August of 1917, plaintiff's assignor, Shubert Theatrical Company, produced an English version of a German musical play, entitled "Wie Einst Im Mai," in this country. For the American version, which was called "Maytime," a complete new musical score was composed by Sigmund Romberg, with lyrics by Rida Johnson Young. By several instruments, some of which are set out in the record, Shubert acquired from the authors certain rights in the music. Of those, it turned over publication and so-called mechanical rights to G. Schirmer, Inc., under the agreement upon which plaintiff's claim is predicated. The agreement, in the form of a letter, dated September 14, 1917, from Shubert to Schirmer, recites that "you are to publish the music of the play 'Maytime' — book and lyrics by Rida Johnson Young, and music by Sigmund Romberg," on the condition, among others, that "You  *  *  *  pay us as royalty for each and every copy sold on the basis of five (5¢) cents per copy, and fifty (50%) per cent. of any and all mechanical instruments  *  *  *  wherein the music of the numbers as composed by

Sigmund Romberg shall be used; also a royalty of five (5¢) cents per copy on each complete orchestral selection sold."

In accord with prevailing custom that the copyright be taken out by the publisher, and in the publisher's own name, Schirmer copyrighted the compositions and continued to publish and pay the royalties until 1945, when the original twenty-eight-year term of copyright expired. It should be noted here that the 1917 agreement, silent as to the period for which Schirmer was authorized to publish, and for which it was obligated to pay royalties, made no express grant of any right to publish after the expiration of that initial term. (Cf. *Fisher Co.* v. *Witmark & Sons,* 318 U. S. 643; *Ricordi & Co.* v. *Paramount Pictures,* 189 F. 2d 469, 471; *Rossiter* v. *Vogel,* 134 F. 2d 908; *Fitch* v. *Shubert,* 20 F. Supp. 314.)

Copyrights for the renewal term were secured by the composer Romberg and the lyricist Rida Johnson Young, or, more precisely — since she had died — her executor.[1] No application for the renewal was made by either Shubert or Schirmer. The latter could not possibly have made such an application. The only persons possessing a right to obtain a renewal under the Copyright Act were the authors, if living, or, if they were dead, their designated statutory successors, unless there was an employment for hire, in which case the employer alone would have had the right to renew (U. S. Code, tit. 17, § 24). As for Shubert, whether or not it could have applied for the copyrights for the renewal term, the simple fact is, it made no attempt to do so. In truth, Shubert disclaimed, even at the trial, any interest or concern in the copyrights or copyright ownership, and has at no time challenged or disputed the copyrights that the authors secured for themselves for the renewal term.

That being so, Schirmer entered into new agreements for the renewal term directly with the authors under which it obtained

---

1. Under the United States Code, in 1945 as well as in 1917 and today, the original term of copyright is twenty-eight years. An additional term of twenty-eight years may be obtained by application made by the author, if then living, or by his widow, widower or children; if there be none, then by the author's executor or, if he died intestate, by his next of kin. And, the statute continued, in the case of a work copyrighted " by an employer for whom such work is made for hire, the proprietor of such copyright " is entitled to the renewal (U. S. Code, tit. 17, § 23, renumbered § 24 in 1947).

the essential license to continue to publish the music in return for a royalty of 6 cents a copy. Coincidentally, in 1945, Schirmer ceased paying the 5-cent Shubert royalty, and, two years later, plaintiff, as assignee, brought this suit for an accounting of royalties.

Although there is no claim that the agreement here involved conferred any right to publish the music after 1945, it is plaintiff's contention that Schirmer must continue to pay the royalties specified therein as long as it publishes and sells the music. In brief, it is plaintiff's thesis that the agreement required Schirmer to pay royalties to Shubert without regard to copyright or copyright term.

The trial court sustained plaintiff's construction and rendered a money judgment for all royalties accrued since 1945. The Appellate Division, two justices dissenting, affirmed. Concluding that the obligation to pay royalties for publication and recording of the works was in no way related to Shubert's ownership of those rights, that court held that Shubert discharged, for all time, whatever obligations it was under when it gave Schirmer the " initial opportunity " of publication in 1917 and that " what incidental arrangements " Schirmer was thereafter " obliged to effect to continue  *  *  *  publication " of the music were " immaterial ".

The effect of this decision is that Schirmer must pay, not only royalties of 6 cents a copy to the owners of the renewal copyright for the privilege of publishing the works for the twenty-eight-year period commencing in 1945, but a royalty of 5 cents to plaintiff for the same privilege, even though the right of plaintiff, or its assignor, to control publication of the works expired in 1945. Moreover, even after the copyright finally expires in 1973 — when the whole world will be able to publish without hindrance and royalty free — Schirmer must, if the decision below stands, continue to pay the 5-cent royalty to plaintiff. We cannot agree that such a construction of the contract accords with the intent of the parties.

A careful reading of the contract itself clearly reveals the parties' intention to require royalty payments only so long as Shubert secured to Schirmer the right to publish the music. The agreement, sparse in statement, simply provides that " you [Schirmer] are to publish the music " and that " you are to pay

us as royalty [5 cents per copy] for each and every copy sold." There is, as already indicated, no express statement of the period for which Schirmer was to publish or for which it was to pay royalties. Yet the authorization to "publish" was necessarily confined to the term of the underlying copyrights, for that is all that Shubert had the power to grant. (See, e.g., *Fitch* v. *Shubert, supra,* 20 F. Supp. 314, 315–316.) And it follows, we believe it plain, that the duty to pay royalties on copies "sold" was intended to be of like duration. The words "publish" and "sold," appearing in such close juxtaposition, must have been used by the parties as parallel and congruent terms. Consequently, only when the copies "sold" were published pursuant to the authority conferred by the agreement, were royalties to be computed upon such sales and paid.

In our view, therefore, there can be no doubt of the parties' design that payments were to be made solely in proportion to the benefits derived by Schirmer from the exercise of the rights granted by the agreement. In this connection, it is of surpassing significance that the consideration reserved to Shubert — "as royalty" — was geared exclusively to the publication of the subject works. For, absent specific contractual provision, it is well settled that, where the consideration for an agreement to publish musical compositions is payment of royalties — as opposed to payment of a lump sum or of installments not related to the usufruct of the copyright, i.e., the reproduction of the work — the grantee or licensee must be given the right to use the license in order to be under an obligation to pay the royalty. (See *Bottlers Seal Co.* v. *Rainey,* 225 N. Y. 369, 372–373; *Herzog* v. *Heyman,* 151 N. Y. 587, 590–591; *Marston* v. *Swett,* 82 N. Y. 526, 529; *Pomeroy* v. *New York Hippodrome Corp.,* 197 App. Div. 114; cf. *Tams-Witmark Music Lib.* v. *New Opera Co.,* 298 N. Y. 163.) The period for which the grantee enjoys the right to produce under the license must necessarily measure the duration of his obligation to pay the prescribed royalty to the grantor. "In legal contemplation," this court wrote in the *Bottlers Seal Co.* case (*supra,* 225 N. Y. 369, 373), "the enjoyment of the undisturbed use of the patent, not the mere execution of the grant, is the consideration for the royalties. The debt is not contracted until the consideration is furnished. (*Garrison* v. *Howe, supra* [17 N. Y.

458]; *Whitney Arms Co.* v. *Barlow,* 68 N. Y. 34; *Gold* v. *Clyne,* 134 N. Y. 262.) If the right to make, use and sell the patent terminates meanwhile; if the licensor does not respect the right; if it had no right to transfer; then the duty to pay royalties ceases; the time for payment never arrives and the debt is not contracted."

Our reading of the contract in suit — as imposing no obligation to pay royalties after the expiration of the underlying copyrights — is reinforced by an established rule of construction applied in the analogous field of patent royalty agreements. (See *E. R. Squibb & Sons* v. *Chemical Foundation,* 93 F. 2d 475, 477; *Tate* v. *Lewis,* 127 F. Supp. 105; *Dwight & Lloyd S. Co.* v. *American Ore Reclamation Co.,* 44 F. Supp. 396.) "There is a presumption that royalties are not to be paid after the expiration of a patent; if the intention is to have them continue longer, the parties should phrase their contract in language from which such intention may fairly be inferred." (*E. R. Squibb & Sons* v. *Chemical Foundation, supra,* 93 F. 2d 475, 477.) In point of fact, an agreement to pay royalties on the manufacture of a patented article "after the patent expires, whatever the legal device employed," may be unenforcible as contrary to public policy. (*Scott Paper Co.* v. *Marcalus Co.,* 326 U. S. 249, 256.) For our purposes, the same rules should apply to royalty agreements involving copyrighted literary property, inasmuch as both forms of property — patent and copyright — may be enjoyed for only a limited period of time under the United States Constitution (art. I, § 8, cl. 8).

It is urged, however, that the cases cited are inappropriate, first, because the contract nowhere uses the term "copyright" and, second, because Shubert did not copyright the songs before turning them over to Schirmer for publication. Such an argument ignores the realities of the arrangement made between parties well versed in the intricacies of music publishing.

In the first place, Shubert's contract with the owner of the original German play, one Hans Bartsch — executed in February of 1917 and from which Shubert's rights in the play stemmed — spoke in terms of copyright. Not only did it stipulate for the renewal of the contract from season to season "during the term of copyright of the American version," but it specified that Bartsch would consent to the introduction of

interpolated music in the play on condition that Shubert procured for him an agreement from the publisher — who proved to be Schirmer — providing that Bartsch, upon the contract's expiration, was to have the exclusive right to use any such interpolated music in the performance of the play "during the life of the copyright". In the light of such language in the underlying agreement between Shubert and Bartsch, the conclusion is unavoidable that Shubert, when but a few months later it made arrangements with Schirmer, was definitely copyright-conscious.

And, in the second place, turning to the contract before us, that between Shubert and Schirmer, it is clear that Schirmer agreed to pay royalties for the privilege of exercising rights existing solely by virtue of section 1 of the Copyright Act, namely, rights to publish and record the works (U. S. Code, tit. 17, § 1, subds. [a], [e]). But for these exclusive rights conferred by the federal statute, Shubert would have had nothing of value to sell or convey. (See *Holmes* v. *Hurst*, 174 U. S. 82, 86; *Atlas Mfg. Co.* v. *Street & Smith*, 204 F. 398, 402, appeal dismissed 231 U. S. 348, certiorari denied 231 U. S. 755; *Krafft* v. *Cohen*, 117 F. 2d 579, 580; *American Code Co.* v. *Bensinger*, 282 F. 829, 833.) Indeed, copyright has been described most aptly as "the only practical method of uniting publication with profit." (*Silverman* v. *Sunrise Pictures Corp.*, 273 F. 909, 910, same case, 290 F. 804, certiorari denied 262 U. S. 758.)

Hence, although the present contract does not mention copyrights or, in so many words, grant a license under pre-existing copyrights, it was necessarily made in contemplation of Schirmer's securing copyrights either in Shubert's name or in its own name. As both parties well knew, since no property rights in literary or musical works survive an authorized publication without due compliance with copyright formalities (see *Holmes* v. *Hurst, supra*, 174 U. S. 82; *National Comics Publications* v. *Fawcett Publications*, 191 F. 2d 594, 598; *Krafft* v. *Cohen, supra*, 117 F. 2d 579; *American Code Co.* v. *Bensinger, supra*, 282 F. 829, 833), Schirmer's publication of the music without first copyrighting it would have caused it to fall into the public domain, destroying, not only the rights granted to Schirmer, but also those reserved to Shubert. (See *American Code Co.* v. *Bensinger, supra*, 282 F. 829, 833; *Tams-Witmark Music Lib.*

v. *New Opera Co., supra,* 298 N. Y. 163.) Copyrighting by
Schirmer was, therefore — contrary to the basic premise of
the dissenting opinion (pp. 381–382) — a necessarily implied
covenant of the agreement, and the publisher was under a duty
to take whatever steps were necessary to safeguard the rights
which were the subject of the bargain.

Schirmer did, as we have seen, copyright the compositions and,
in line with established trade practice, in its own name. It is
to be borne in mind that Schirmer could not legally have done
this in the absence of authority, express or implied, from
Shubert; no one is entitled to obtain a copyright unless he him-
self is the author, or is — as Shubert was — the assignee of
the author. (See, e.g., *Mifflin* v. *R. H. White Co.,* 190 U. S.
260; *Houghton Mifflin Co.* v. *Stackpole Sons,* 104 F. 2d 306,
certiorari denied 308 U. S. 597; *Borden* v. *General Motors
Corp.,* 28 F. Supp. 330, 334.) And, after obtaining the copy-
rights in this case, Schirmer held them in trust for Shubert
to the extent that the latter reserved all rights except publication
and mechanical rights, that is, the rights on which royalties were
to be paid. (See *Bisel* v. *Ladner,* 1 F. 2d 436; *Ford* v. *Blaney
Amusement Co.,* 148 F. 642; *Quinn-Brown Pub. Corp.* v. *Chilton
Co.,* 15 F. Supp. 213, 214.)

It is thus impossible to treat this contract as one which does
not involve a grant or license of rights in copyrighted musical
compositions, and, accordingly, the rules of construction appli-
cable to such contracts are pertinent here. The agreement may
not, therefore, in the absence of express language, not here
present, be construed to require payment of royalties after the
expiration of the underlying copyrights. (See *E. R. Squibb &
Sons* v. *Chemical Foundation, supra,* 93 F. 2d 475, 477.)

Any other construction would, moreover, defeat the undoubted
intention of the parties. Certainly, these experienced firms
could not have contemplated continuation of royalty payments
after the rights granted to Schirmer had expired and the exclu-
sive right to publish the music had vested in a third party. To
accept plaintiff's position, we would have to ascribe to the parties
an intent, not only that Schirmer be required to pay multiple
royalties during the renewal term — an intention not to be
inferred (see *Marston* v. *Swett, supra,* 82 N. Y. 526, 533) — but
also that Shubert be entitled to exact royalties after the copy-

rights had actually expired and the works had entered the public domain. In our view, such an interpretation would be indefensible. " The thought behind the phrase proclaims itself misread when the outcome of the reading is injustice or absurdity." (*Surace* v. *Danna*, 248 N. Y. 18, 21.)

For reasons which must now appear evident, it may not be said — as it was in the court below — that Shubert was entitled to collect royalties in perpetuity merely because it executed a document in 1917 giving Schirmer the initial privilege of publication at that time. Obviously, it was not merely the " designation " of Schirmer as publisher, but the grant of a right to undisturbed enjoyment of the privileges conveyed, that constituted the consideration for the payment of royalties. (See *Bottlers Seal Co.* v. *Rainey, supra,* 225 N. Y. 369.) Nor may it be said that the arrangements that Schirmer was compelled to make with the authors to be permitted to continue publication for the renewal term were merely " incidental " and, therefore, " immaterial." Those agreements were just as basic and necessary in acquiring rights for the post-1945 period as was the agreement with Shubert for the original term. In fact, Shubert conceded, by its acquiescence in the authors' claim to the right of copyright renewal, that in 1917 it had nothing to give Schirmer beyond the initial twenty-eight-year period. Schirmer had no basis whatever for reliance on the title of its grantor after 1945, inasmuch as the latter disclaimed any interest in control or ownership of the copyrights, and did not even register a claim to the renewal term.

We would add a further word concerning the suggestion that Shubert might have owned these rights for the second term of twenty-eight years, either as employer for hire or otherwise.

The legal effect of assignments from the authors, Romberg and Young, to Shubert did not, so far as the record before us reveals, give the latter the right to the copyrights for the renewal term upon the expiration of the initial term. The right of renewal afforded the authors of a copyrighted work is in reality a new grant or estate, not arising out of the original copyright (see *Silverman* v. *Sunrise Pictures Corp., supra,* 273 F. 909, 911; *Fitch* v. *Shubert, supra,* 20 F. Supp. 314, 315), and, absent proof, completely lacking here, that Shubert had obtained from either the composer or the lyric writer any rights beyond the original

term, that is the period for which the rights were conveyed. (See *Fisher Co.* v. *Witmark & Sons, supra,* 318 U. S. 643; *Ricordi & Co.* v. *Paramount Pictures, supra,* 189 F. 2d 469; *Rossiter* v. *Vogel, supra,* 134 F. 2d 908.) If there could have been any doubt that the term was so limited in this case, it was laid to rest by Shubert's action, or, rather, inaction, in 1945. Its conduct was patently inconsistent with any claim that it possessed rights following that first copyright term. If Shubert had any right to renew as employer for hire, it would have had to obtain the renewals in its own name. (See *Tobani* v. *Carl Fischer, Inc.,* 98 F. 2d 57.) As already appears, Shubert did not, by word or action, even intimate that it had any right in or to the copyrights for such a period.

Nor would plaintiff be helped, or its position improved, by supposing that the present copyright owners, Romberg and the Young estate, lacked power to secure the copyright renewals, on the ground that the true author was Shubert as employer for hire. Such a hypothesis could lead only to the conclusion that no valid copyrights existed and that the work had fallen into the public domain, deprived of all protection. (See *Tobani* v. *Carl Fischer, Inc., supra,* 98 F. 2d 57.) Certainly, no court in a case such as this would or should declare a forfeiture of the rights of those who, as authors, obtained the renewal copyrights. And, beyond that, if such a forfeiture were to be adjudged, with the consequent termination of copyright protection, the result would be, as already demonstrated, that Schirmer's duty to pay royalties would likewise terminate.

In sum, then, Schirmer's obligation to pay royalties under the 1917 agreement was measured by the duration of the rights thereby conferred. That obligation, accordingly, came to an end in 1945. To the soft impeachment — that by so holding we are " construing " this contract " to make [it] mean " what we believe it " should have said in the first place " (opinion of DESMOND, J., p. 378) — we cannot resist observing, what, perhaps, has been overlooked, that there " is no more likely way to misapprehend the meaning of language — be it in a constitution, a statute, a will or a contract — than to read the words literally, forgetting the object which the document as a whole is meant to secure." (*Central Hanover B. & T. Co.* v. *Commissioner of Int. Rev.,* 159 F. 2d 167, 169, per LEARNED HAND, J.)

The judgment should be reversed and the complaint dismissed, with costs in all courts.

DESMOND, J. (dissenting). Probably every court in the land is tempted, occasionally, to " construe " contracts so as to make them mean what the courts think they should have said in the first place. But the old, safe rule is that we judges must " concern ourselves with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote " (*Raleigh Associates* v. *Henry,* 302 N. Y. 467, 473). The suit we are now deciding is brought to enforce a plain, simple, home-drawn agreement between two highly experienced business concerns. An attempt by us to write new terms into it is unwarranted and gratuitous. " We may not now imply a condition which the parties chose not to insert in their contract " (*Raner* v. *Goldberg,* 244 N. Y. 438, 442; see *Rehill* v. *Rehill,* 306 N. Y. 126, 133; *Nichols* v. *Nichols,* 306 N. Y. 490, 496).

On August 15, 1917, Shubert Theatrical Company, assignor of plaintiff, produced on a New York City stage for the first time an operetta or musical play called " Maytime ". Shubert was unquestionably the sole owner of the whole of that production. " Maytime " was an adaptation into English, accomplished by translating the book of a German musical play, and interpolating entirely new songs. Shubert had bought, from the German owner, the American and Canadian rights and had procured and paid for the translation of the libretto, and for the writing of the lyrics and music of the new songs. About a month after the Broadway opening of " Maytime ", Shubert and this defendant entered into a written contract in the form of a letter from Shubert to this defendant, a large music publishing house, as follows:

"New York City, Sept. 14, 1917.

G. Schirmer, Inc.

New York City.

Attention Mr. G. Schirmer, Secretary

Gentlemen:

Confirming our conversation of recent date it is understood that you are to publish the music of the play 'Maytime'— book and lyrics by Rida Johnson Young, and music by Sigmund Romberg, under the following conditions:

You are to pay us as royalty for each and every copy sold on the basis of five (5¢) cents per copy, and fifty (50%) per cent. of any and all mechanical

instruments of whatsoever name or nature, including any inventions that may be made from time to time, wherein the music of the numbers as composed by Sigmund Romberg shall be used; also a royalty of five (5¢) cents per copy on each complete orchestral selection sold. All payments to be made quarterly.

You are also to pay the International Play Bureau an additional two (2¢) cents on each copy of music sold, but you shall make your contract with Mr. Bartsch of the International Play Bureau separately. The contract shall be collateral; that is to say, both contracts are to be treated so that seven (7¢) cents shall be paid for each copy of music sold.

It is also understood that all emoluments of whatsoever name or nature received by you from any person, music hall, cabaret, or theatre wherein the music of Maytime is used, shall inure to our benefit and paid to us, and you shall give no one any consent of whatsoever name or nature to use same without first having our permission in writing.

If this confirms your understanding your signature at the bottom hereof will constitute this a valid agreement between us.

You are to pay for all orchestrations made for the numbers which you publish, and deduct same from the accrued royalties.

Very truly yours,

SHUBERT THEATRICAL CO.

by (sgd.) J. J. SHUBERT

We hereby accept the above:

    G. SCHIRMER, INC.

  by GUSTAVE SCHIRMER

         Secretary "

Although that letter contract is dated September 14, 1917, it is conceded that it embodied the terms, and all the terms, of earlier oral arrangements made between the parties before the play opened. The day after the play opened, defendant published and put on sale eight of the songs. At the same time, defendant, in its own name, took out statutory copyrights on those same songs. It is undisputed that there was a custom in the musical world that when a music publisher bargained for and obtained the right to publish music like this, the music publisher was privileged to copyright the music in his own name. But there is not a word in the contract about a copyright and no copyright had been taken out or discussed or arranged for at the time the oral agreement was made. There is no evidence that Shubert promised or intended to have anything to do with a statutory copyright for the songs. There is nothing in the record to justify any claim or conclusion that the rights of the parties under the agreement were to be subject to copyright or copyright laws, or to the existence or continuation or renewal of a statutory copy-

right. So far as this record shows, the parties meant just what they said in the letter above quoted, that is, that Shubert gave defendant the right to publish the songs and defendant, in return for that present and complete grant, agreed that it would pay to Shubert fixed amounts for every copy thereafter sold. No specific time of duration was expressed in the agreement but none was needed, since defendant would be bound to continue to pay so long as it should continue to publish. Any contention based on the absence of a fixed termination date is rendered academic by the fact that defendant continued, and continues to this day, to publish this music (*Cammack* v. *Slattery & Bro.*, 241 N. Y. 39, 45).

When the original statutory copyright term expired in 1945, the music was still being sold by defendant, but defendant refused to make any more payments to Shubert (or plaintiff). Instead, when payment was demanded of it, defendant called plaintiff's attention to the fact that, shortly before the expiration in 1945 of the original twenty-eight-year copyright term, Sigmund Romberg, who had written the music for the new songs while a paid employee of Shubert, and the estate of Mrs. Rida Johnson Young, who had written the lyrics under some sort of employment with Shubert, had taken it upon themselves to renew the copyrights originally taken out by defendant. Romberg and the Young estate had accomplished these copyright renewals without notice to, or knowledge or consent by, Shubert or plaintiff. Such a unilateral act by a third party could not, under any theory we have ever heard of, put an end to the obligations of defendant under the contract here in suit. We emphasize, again, that Shubert and/or plaintiff had nothing whatever to do with the taking out of the original copyright or the purported renewals. Shubert, by the 1917 letter, had made a present transfer of a part of his unquestioned rights in the play, and, in consideration for that transfer, defendant agreed that whenever it should publish any of the songs, it would pay Shubert a fixed sum per copy. Since those renewals, or purported renewals, of the copyrights had no effect in this situation except possibly to suggest to defendant a line of defense, we will not discuss their validity (see *Tobani* v. *Carl Fischer, Inc.*, 98 F. 2d 57; *Shapiro, Bernstein & Co.* v. *Bryan*, 27 F. Supp. 11; U. S. Code, tit. 17, § 24).

Defendant resists payment on this sole ground: it insists that there must be read into the letter contract of 1917 (*supra*) an implied term that defendant's obligation to pay was to continue only until the end, in 1945, of the original copyright term of twenty-eight years. A short answer would seem to suffice. Since there is nothing illegal or even unfair about a publisher agreeing to pay fees to the owner of a work so long as the publisher shall continue to publish the work, and since there is not a word in this record to the effect that anybody said or suggested or had in mind that defendant's obligations would cease in 1945, we would be rewriting the contract to put in anything like that. However, defendant calls to its aid an elaborate argument from copyright law. Defendant, to excuse itself from further performance of its promise, attempts to apply an inapplicable line of decisions, all to the general effect that, when the holder of a copyright or a patent issues a license thereunder, the obligation of the licensee to pay royalties ends when the copyright or patent for any reason ends (*Tams-Witmark Music Lib.* v. *New Opera Co.*, 298 N. Y. 163; *Ricordi & Co.* v. *Paramount Pictures*, 189 F. 2d 469). But Shubert did not issue a license under a copyright. He had not copyrighted the songs, had no intention of copyrighting them, and, as he testified without dispute, was not in any way concerned with the copyrights or renewals. Shubert's bargain with defendant was that defendant could publish the music for a price. Defendant's copyrighting of the music was, apparently, pursuant to a custom of the trade, although not by any express permission, but, in any event, it was defendant's own act for its own benefit. Shubert never agreed to take out a copyright or to protect, continue or renew the copyright, and defendant never asked Shubert to do any of those things. The whole course of conduct showed that Schirmer got what it bargained for, that is, the right to produce the music, and that Shubert had no remaining obligation. What defendant really wants us to hold is that, when the owner of an uncopyrighted work sells to another the right to publish it, the obligation of the grantee, if he himself afterwards takes out a copyright, is measured, as to duration, by the copyright term. That would be equivalent to saying that if defendant had taken on an obligation unlimited in time, he could, by his own act, cut down his own obligation by taking out a copyright.

The practical explanation of this situation is that, when this show opened in 1917, no one knew or had any reason to believe that its songs would become minor classics and still be sold in 1945 and 1950. This was " show business ", and the parties were practical showmen and publishers, dealing with the probabilities as of then. What they meant, like what they said, relates to 1917 and cannot be changed by the fortunate circumstance that the " Maytime " music is still being sung, or the unfortunate (for defendant) fact that defendant is subject to two separate demands for royalties.

Defendant, as a minor point, argues that there was error in the denial of its motion to transfer the cause from the " Special Term calendar " to the " Contract Trial Calendar ". In other words, defendant says that the cause should have been tried as one at law rather than as one in equity. The complaint demanded various forms of purely equitable relief, although no such relief was pressed for or granted at the trial, the judgment being a simple one for money damages only. However, we find it unnecessary to decide whether defendant would have been entitled, under other circumstances, to have this money demand tried " at law ". The suit had been on the equity trial calendar for about six years when defendant first moved to transfer it therefrom. At no time, so far as this record shows, did defendant demand a jury trial. We think that no error was committed in denying the transfer motion (see Civ. Prac. Act, § 8).

The judgment should be affirmed, with costs.

FROESSEL, VAN VOORHIS and BURKE, JJ., concur with FULD, J.; DESMOND, J., dissents in an opinion in which CONWAY, Ch. J., and DYE, J., concur.

Judgment reversed, etc.