**DWIGHT & LLOYD SINTERING CO., Inc.,
v. AMERICAN ORE RECLAMA-
TION CO.**

District Court, S. D. New York.
Dec. 11, 1939.

See, also, 44 F.Supp. 391; 44 F.Supp. 401.

Spencer, Ordway & Wierum and Otto C. Wierum, all of New York City, for plaintiff.

Davis, Polk, Wardwell, Gardiner & Reed, Theodore Kiendl, John L. Jackson, and A. S. Edmonds, all of New York City, for defendant.

BONDY, District Judge.

This is a motion by the plaintiff to confirm the report of the special master filed pursuant to the decision of the court recommitting his report to him for further consideration. D.C., 44 F.Supp. 391.

This suit was brought for the termination and cancellation of patent licensing agreements, an accounting of royalties and incidental relief. The defendant no longer urges its counterclaim. It has amended its answer, eliminating the prayer for relief on the counterclaim and it prays for a de-

cree terminating the licensing agreement of April 7, 1911, and the agreements supplementary thereto.

The agreement dated April 7, 1911, between the assignors of the parties hereto, granted to the licensees an exclusive license in the iron and steel field, including the right to issue sublicenses, under all patents either then owned or thereafter acquired by the licensor, relating to processes and apparatus for the sintering of ores. The duration of the license was limited to the life of certain listed patents, all of which expired on or before March 30, 1926. The licensees agreed "to pay to the Licensor, during the continuance of this License, as rent or royalty, the sum of three cents for each avoirdupois ton of merchantable product of the said processes and apparatus, produced by the Licensees and Sub-Licensees." It was agreed that "if the patents covered by this License and essential to the operation of the said processes and apparatus of the Licensor, shall be declared wholly null and void by any Court of last resort of competent jurisdiction * * * then from and after such date the obligation of the Licensees hereunder to pay the royalties in this License specified, * * * shall cease and determine."

On March 25, 1926, five days before the expiration of this license, the parties hereto executed an agreement providing in part that "all rights under the letters patent referred (to) in the license agreement of April 7, 1911, conferred upon the licensees therein, and the Reclamation Company as the successor to said licensees shall extend to any and all patents referred to in said license agreement of April 7, 1911 and all patents now owned or controlled by the Sintering Company, or that may hereafter be owned or controlled by the Sintering Company, relating to the art of sintering, to the full end of the term or terms of each and every of said letters patent anything in said license agreement to the contrary notwithstanding, subject to the payment by the Reclamation Company of the royalties to be paid by it to the Sintering Company in accordance with the provisions of said license agreement, and subject also to the performance by the Reclamation Company of the other obligations assumed by it under said agreement in so far as the same may be consistent with this agreement."

On November 30, 1928, a third agreement was executed whereby the parties agreed, in part, that if the Reclamation Company should reduce its scale of royalties to its licensees, then the royalties payable by the Reclamation Company to the Sintering Company should be reduced proportionally.

■ The defendant, refusing to pay to the plaintiff any royalties after June 30, 1932, relies in part upon the provision of the 1911 agreement exempting the licensees from the payment of royalties in the event that the patents essential to the operation of the licensor's processes and apparatus should be declared wholly null and void by a court of last resort. In Dwight & Lloyd Sintering Co. v. Greenawalt, D.C., 20 F.2d 533, affirmed 2 Cir., 27 F.2d 823, the following Dwight & Lloyd patent claims were considered: claims 3, 6, 12, 13, 14 and 16 of patent 882,517; claim 2 of patent 1,020,345; claims 1, 2, 16, 20, 25, 30 and 35 of reissue patent 13,758; claims 3 and 4 of patent 1,102,982; claims 1, 4, 6 and 8 of patent 1,254,316; claims 1, 2 and 3 of patent 1,433,-349; claims 8, 9 and 10 of patent 1,433,350; claims 4 and 7 of patent 1,433,351; and claims 1, 5,.8 and 9 of patent 1,433,352.

Defendant asserts that the patents essential to the operation of the licensor's processes and apparatus were numbers 882,517, 882,518, 1,020,345, 1,027,084 and 1,027,110. But patents number 882,517 and 1,020,345, although at issue in the Greenawalt litigation, were not declared invalid in any respect, and the other three patents were not at issue in that case. Accordingly, on the defendant's own designation of the "essential" patents, it follows that none of these has been declared null and void. It therefore is not necessary to consider the master's interpretation of the word "essential" and the defendant's objections thereto. Moreover, the agreement of November 30, 1928, between the parties, which clearly contemplates the continued payment of royalties by the defendant to the plaintiff, was executed after the decision of the Circuit Court of Appeals in the Greenawalt case on August 20, 1928.

■ The defendant further contends that "upon termination of the essential patents, whether by expiration of time or by occurrence of their invalidity as a matter of law, defendant thereupon is evicted from the patent protection convenanted by the license agreement to be given, and by the terms of the agreement is relieved from royalty liability." The agreements, however, provide for a cessation of royalties only upon the declaration of the invalidity of the essential patents by a court. They do not provide for

a cessation of royalties upon the expiration of the essential patents. Furthermore, in 1926 the parties extended the term of the license agreement to the end of the term of each and every patent then owned or controlled by the Sintering Company, or which might thereafter be owned or controlled by it, relating to the art of sintering. It is difficult to understand why the parties agreed to such an extension if the defendant's position be sound that it was not obligated to pay any royalties whatever after May 21, 1929, the date of expiration of the last-issued patent which defendant asserts to have been "essential". It is not reasonable to assume that the plaintiff agreed to constitute the defendant its exclusive licensee under patents expiring after 1929, without any compensation to the plaintiff. It is also significant that the defendant continued the payment of royalties to the plaintiff for more than three years after May 21, 1929. As another justification for its refusal to pay royalties after June 30, 1932, the defendant asserts that it is liable for royalties only upon sinter produced by its licensees after that date pursuant to valid and unexpired patents of the plaintiff and that it is not liable merely because its licensees used the processes and apparatus described in patents which expired before June 30, 1932. The plaintiff maintains that the defendant agreed to pay royalties upon sinter produced by the use of plaintiff's processes and apparatus, whether the patents thereon had expired or not. The master sustained the plaintiff's contention.

If this ruling be upheld, the defendant must pay royalties for the use by its licensees of the plaintiff's inventions which have passed into the public domain. Under the provisions of the 1926 extension agreement, this liability would continue to the full end of the term of each and every patent now owned or hereafter acquired by the plaintiff, relating to the art of sintering.

The 1926 contract extended the term of the 1911 license agreement, which was about to expire, "subject to the payment by the Reclamation Company of the royalties to be paid by it to the Sintering Company in accordance with the provisions of said license agreement. * * *" The 1911 agreement required the payment to the licensor, during the continuance of the license, of three cents per ton of merchantable product of the processes and apparatus covered by patents either then owned or thereafter acquired by the li-

censor, produced by the predecessors of the defendant herein or by their licensees.

"There is a presumption that royalties are not to be paid after the expiration of a patent; if the intention is to have them continue longer, the parties should phrase their contract in language from which such intention may fairly be inferred." E. R. Squibb & Sons v. Chemical Foundation, 2 Cir., 93 F.2d 475, 477, per Swan, J. The language employed in the 1911 and 1926 contracts does not convincingly disclose an intention to require the payment of royalties upon sinter produced pursuant to expired patents of the Sintering Company. Cf. Sproull v. Pratt & Whitney Co., 2 Cir., 108 F. 963; Pressed Steel Car Co. v. Union Pacific R. R. Co., 2 Cir., 270 F. 518. It is not significant that two of the plaintiff's patents, numbers 882,-517 and 882,518, had expired prior to the execution of the second contract, since the plaintiff then owned many other patents, which were still in force and the agreement contemplated that the plaintiff might thereafter acquire other patents relating to sintering, which were to be available for licensing by the defendant. Nor is the fact that the defendant may have collected royalties from some of its licensees who paid for the use of plaintiff's expired patents, inconsistent with the court's interpretation. If the defendant has been unjustly enriched it has not been at the plaintiff's expense. The royalties payable by the defendant to the plaintiff were not dependent upon the royalties paid to the defendant by its licensees.

The defendant accordingly is bound to pay royalties only upon sinter produced by its licensees subsequent to June 30, 1932, under any patents of the plaintiff in force during the time of such production.

The master has not reported findings which enable the court to determine the amount of the royalties owing to the plaintiff upon this basis. He merely found that five patents of the plaintiff were used by the defendant's licensees subsequent to the agreement of March 25, 1926, and that four others were used after the decree in Dwight & Lloyd Sintering Co. v. Greenawalt, D.C., 20 F.2d 533, affirmed 2 Cir., August 20, 1928, 27 F.2d 823. The report must be recommitted to the master for further findings upon the following issues: Did any of the defendant's licensees produce sinter after June 30, 1932, pursuant to the processes or apparatus covered by

any of the plaintiff's then subsisting patents? If so, the master is directed to enumerate the sublicensees, the subsisting patents of the plaintiff utilized by each in such production, the period during which each patent was used and the amounts of sinter produced pursuant to the processes or apparatus described in such patents, and to compute the royalties due to the plaintiff.

In the absence of findings upon the foregoing issues, it can not be ascertained whether any sublicensee has used only those patents or patent claims which defendant contends must be deemed invalid. Accordingly it would serve no useful purpose to determine at the present time whether the defendant is liable for royalties in such a case. Nor is it necessary to determine at this time the applicability of the provision of the 1911 agreement relating to minimum royalties, since the defendant may be liable for sums in excess thereof.

■ The special master reports that the defendant violated its implied obligation as the exclusive licensee of the plaintiff's patents to exploit the patents with due diligence when it granted licenses solely under its own patents to the United States Steel Corporation in 1931 and to the Republic Steel Corporation in 1935.

The defendant's assignor had issued a license in 1912 to the United States Steel Corporation, which refused to pay any royalties thereunder after 1929. Its patent attorney testified that in conversations he had with the defendant's president shortly before March 30, 1931, relative to a new license, he insisted that his client was not liable to pay royalties under the 1912 license upon new installations, and it is not contradicted that the steel corporation also asserted that under the express provisions of the 1912 license it was granted a free license to use in installations erected after 1929 all the patents listed and covered by that license.

Plaintiff relies upon the testimony of the steel corporation's patent attorney to the effect that until the defendant's president informed him to the contrary, he supposed that the new license executed in 1931 was to include Dwight & Lloyd patents, and that he insisted upon the inclusion in the license of a guaranty by the defendant against liability of his client in case the Dwight & Lloyd company should make a claim against it for infringement of its patents.

Whether right or not, the United States Steel Corporation apparently was not willing to pay for the use of any of the plaintiff's patents. Accordingly it can not be said that the defendant could have induced the steel corporation to accept and pay for a license under the plaintiff's patents, however diligently it might have sought to do so. The defendant was not obliged to contribute the use of its own patents to induce the steel corporation to accept a license under Dwight & Lloyd patents. The master's conclusion that the execution of the 1931 license to the steel corporation constituted a violation of the defendant's implied obligation to exploit the plaintiff's patents, accordingly must be rejected.

On December 2, 1935, the defendant issued a license to the Republic Steel Corporation under the defendant's patents alone. Although the Republic Steel Corporation license and also the license granted to the Monsanto Chemical Company, discussed subsequently herein, were not within the terms of the order of reference, the defendant interposed no objection to the consideration of these licenses by the master or by the court. The Republic Steel Corporation had previously acquired licenses issued to other companies by the defendant under Dwight & Lloyd patents. The corporation discontinued the payment of royalties to the defendant under these earlier licenses as to one of three plants in 1930, as to another in 1934 and as to the third in 1935.

The plaintiff's criticism of the defendant's conduct with respect to the Republic Steel Corporation would seem to be directed more to the failure of the defendant to enforce the payment of royalties under the earlier licenses, with which payments the plaintiff had no concern, than to the failure to include Dwight & Lloyd patents in the 1935 license. In view of the steel corporation's refusal to pay further royalties under the licenses of Dwight & Lloyd patents, it can hardly be said that the circumstances were such that the defendant could have induced the Republic Steel Corporation to accept a new license under Dwight & Lloyd patents and pay for the use of such patents. The master's conclusion that the defendant violated its obligation to exploit plaintiff's patents by executing the Republic Steel Corporation license of December 2, 1935, accordingly can not be confirmed.

■ On December 31, 1935, the defendant granted a license under its own patents

to the Monsanto Chemical Company for the sintering of phosphate bearing materials.

The agreement of April 7, 1911, conferred upon the licensees an exclusive license under the licensor's patents either then owned or thereafter acquired by it, in the iron and steel field. The licensor reserved the right to terminate the license "in case the Licensees shall use or permit any sublicensee to use the processes, apparatus and inventions herein licensed for any purpose other than for use in the manufacture of iron and steel." The 1926 extension agreement was expressly made subject to the performance by the Reclamation Company of the obligations assumed by it under the 1911 agreement in so far as consistent with the later agreement. The 1928 agreement refers in its first "whereas" clause to the fact that the "Reclamation Company is a licensee of Sintering Company in a restricted field under certain patents relating to sintering."

The master reports that "the agreements between the parties show that defendant's use of plaintiff's patents during the continuance of the agreements was to be confined to the ferrous field," and that "the license to the Monsanto Chemical Company under the defendant's patents, being outside of the ferrous field, is a breach of the agreement between the parties, because as long as the agreement continues, defendant impliedly undertook to confine itself to the ferrous field."

The agreements between the parties required the defendant to confine its use of the licensed processes and apparatus to the iron and steel field. The defendant, however, did not undertake to confine its use of any improvements on the licensed processes and apparatus which it itself might make or acquire, to the ferrous field nor did it agree to confine its business generally to any particular field. This is confirmed by the fact that the 1911 contract provides that if the licensees made or acquired any improvements on the licensed processes and apparatus, they would, upon request, grant to the licensor the right to use such improvements without compensation in its business of smelting ores of lead, copper, zinc and the precious metals. Although the parties thus contemplated that the licensees might make or obtain improvements on the licensed processes and apparatus, at no time did they impose any restrictions upon the licensees' use of their own improvements in any field.

The plaintiff contends that while the Monsanto license grants rights only under defendant's patents, these patents are valueless unless utilized in connection with the plaintiff's standard process and apparatus and that the defendant accordingly is using plaintiff's processes and apparatus in the non-ferrous field, contrary to the provisions of the 1911 contract. This would be a forceful argument were it not for the fact that the patents covering this standard process and apparatus had expired prior to 1935, when the Monsanto license was executed. The Monsanto Company was free to use these inventions without a license from anyone. The only rights which the defendant conferred upon it were rights under the defendant's patents. It can not be said that the defendant thereby "used" or "permitted any sublicensee to use" the plaintiff's licensed processes and apparatus outside the ferrous field, within the meaning of the 1911 contract. One needs no "permission" to use something which he already possesses the right to use.

The execution of the license to the Monsanto Chemical Company in 1935 accordingly did not constitute a violation of the agreements between plaintiff and defendant.

The report is recommitted to the special master for further findings and the computation of the royalties owing to the plaintiff in accordance herewith.

Both parties pray for the termination of the license agreements. The court accordingly will consider an application for a decree granting relief proper in such circumstances.