**AR–TIK SYSTEMS, INC., Appellee,**

v.

**DAIRY QUEEN, INC., Appellant.**

**No. 13447.**

United States Court of Appeals Third Circuit.

Argued March 10, 1961.

Decided March 28, 1962.

See also 22 F.R.D. 122.

Wallace D. Newcomb, Philadelphia, Pa. (Paul & Paul, John H. Austin, Michael H. Egnal, Philadelphia, Pa., on the brief), for appellant.

Mark D. Alspach, Philadelphia, Pa. (Virgil Bozeman, Moline, Ill., Owen J. Ooms, Malcolm S. Bradway, Ooms, Welsh & Bradway, Chicago, Ill., Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

In the amended complaint filed in the United States District Court for the Eastern District of Pennsylvania, Ar-Tik Systems, Inc., (Ar-Tik) a corporation of

Indiana, alleged that it entered into an agreement on September 7, 1946 with H. A. McCullough, H. F. McCullough and J. F. McCullough, co-partners doing business as McCullough's Dairy Queen,[1] whereby it licensed the McCulloughs to use and to permit others to use a frozen dessert machine, constructed under its United States Patent 2080971, "within the area comprised by the eastern part of the United States, including the Commonwealth of Pennsylvania, upon payment of a certain consideration based upon the quantities of frozen dessert used and upon certain other considerations more fully enumerated therein"; that under the terms of a series of assignments from the McCulloughs and others there was executed a certain contract dated November 29, 1949, which Ar-Tik averred had been assigned to the defendant Dairy Queen, Inc., a corporation of the State of Washington, registered to do business in the Commonwealth of Pennsylvania, whereby it became entitled to use within the territorial limits of Pennsylvania the trade name "Dairy Queen" in connection with the manufacture and sale of frozen dessert "upon, inter alia, the payment of certain considerations to the plaintiff and the plaintiff's assignors" under the said agreement of September 7, 1946; that prior to November 29, 1949 the McCulloughs coined and registered the trade name "Dairy Queen" and in conjunction with the plaintiff and others developed it by extensive nation-wide advertising, supervision of manufacture, sale and method of sale of frozen dessert known as "Dairy Queen" so that the trade name was enhanced in value; that as the result of the acquisition by the defendant, Dairy Queen, Inc., of the rights and liabilities under the contract of November 29, 1949 it became obligated to account to Ar-Tik and the McCulloughs by showing the quantity of frozen dessert mix used and to make payments upon the basis thereof and that in violation of its agreement defendant, Dairy Queen, Inc. has failed to account and to make payments to Ar-Tik and has forfeited the right to use the trade name.

Ar-Tik prayed, among other things, for the production of books and records; a money judgment for such sum as might be found to be due; a temporary injunction to be made permanent enjoining the defendant, Dairy Queen, Inc., from doing anything connected with the sale of the frozen dessert product to the public under the trade name "Dairy Queen"; and that the court shall declare that the defendant has violated paragraph 3 of the agreement of November 29, 1949 and paragraph 9 of the agreement of October 18, 1949 and that the said contracts shall be declared null and void as to any rights defendant, Dairy Queen, Inc., may have acquired therein.[2]

In its answer the defendant, Dairy Queen, Inc., generally denied the allegations of the complaint. However, it admitted the assignment to it of the agreement of November 29, 1949.

The defendant, Dairy Queen, Inc., further averred in its answer that the agreement of October 18, 1949 "referred to in paragraph 10 of the complaint and any assignments thereof are unenforceable and ineffective" as a result of paragraphs 7 and 12 of the said agreement of October 18, 1949;[3] and that defendant, Dairy

---

1. Actually the contract was executed with H. A. McCullough who subsequently assigned it to the partnership.

2. Paragraphs 3 and 9 of the respective agreements concern defaults. Apparently Ar-Tik relies on paragraph 3 of the agreement of October 18, 1949 which provides for payments "in the nature of royalty" although no specific reference is made to it in the complaint as amended.

3. There is no specific reference to the contract of October 18, 1949 in paragraph 10 of the complaint as amended; only the contract of November 29, 1949 is mentioned there. Paragraphs 7 and 12 of the agreement of October 18, 1949 provide as follows:

"That the Second Party or any others, shall not sell or offer for sale any other frozen or semi-frozen dairy product, use any other type or make of freezer, or sell any of the said machines, move any of the said machines purchased through the First Party outside of the State of Pennsylvania for the purpose

Queen, Inc., is the sole owner and possessor of the trade name "Dairy Queen" within the State of Pennsylvania.

The defendant, Dairy Queen, Inc., also filed a counterclaim for a declaratory judgment that Ar-Tik has no right in the trade name "Dairy Queen" within the State of Pennsylvania. The plaintiff Ar-Tik answered the counterclaim by denying substantially its allegations.

The pleadings tend to sideglance the real issues in the case which were drawn into much sharper focus by the pretrial proceedings and the hearings before the court.

An opinion was filed by the District Court, in which findings of fact and conclusions of law were made and discussed.[4] In effect it was held, among other things, that the law of Illinois should govern the

of operating them, without first obtaining the written consent and approval of the First Party. That two copies of each subcontract shall be forwarded to the office of First Party within ten days after it is completed and signed.

\* \* \* \* \*

"12. That the maximum charge to all operators within the State of Pennsylvania for the rights to operate Dairy Queen Machines shall not exceed 29¢ a gallon on all of the mixes used or sold by them, unless and until First Party shall approve a higher charge per gallon."

4. The opinion is unpublished. The critical findings of fact read:

"6. On October 18, 1949, at Moline, Illinois, H. A. McCullough, acting for himself, H. F. McCullough and J. F. McCullough under the name and style of McCullough's Dairy Queen, entered into a written contract with Burton F. Myers, Robert J. Rydeen, M. E. Montgomery and Howard Dale granting these four individuals an exclusive right to develop a described territory in Pennsylvania for the restricted conduct of the operation of Dairy Queen Stores, subject to the provisions of the offer of the four individuals set forth in the contract.

"7. In consideration of this grant to these four individuals, they obligated themselves under the contract, inter alia, to pay direct or cause to be paid direct to the plaintiff the sum of four cents per gallon on all the mix used or sold through any and all Dairy Queen stores and/or freezing machines and dispensing machines operated in Pennsylvania by the four individuals and/or their subcontractors in the nature of a royalty 'regardless of the expiration of the patent' on the freezing machines."

The District Court stated, as conclusions of law:

"1. This Court has jurisdiction of the subject matter and the parties to this action.

"2. The contract of October 18, 1949 was at all times and still is a valid and subsisting contract between the parties thereto.

"3. From and after the assignment of December 23, 1949, the defendant has been at all times and still is required and obligated to pay to plaintiff the sum of four cents per gallon on all mix used or sold through any and all Dairy Queen stores and/or freezing machines operated in defendant's Pennsylvania territory as required by the contract of October 18, 1949.

"4. By failing and refusing to make the aforesaid payments to plaintiff from and after December, 1954, defendant has breached and violated its contractual agreement and undertaking.

"5. Defendant has failed to establish any valid excuse or justification for the breach and violation of its contractual duty.

"6. Plaintiff is entitled to maintain this action to enforce the right to receive the gallonage payments from the defendant.

"7. Plaintiff is entitled to recover from defendant the sum of four cents per gallon on all mix used or sold through any and all Dairy Queen stores and/or freezing machines operated in defendant's Pennsylvania territory from and after December, 1954, with interest and costs.

"8. Defendant's counterclaim for Declaratory Judgment is unsupported by the evidence and without merit, and is therefore dismissed."

In its discussion of the case the District Court said:

"The contract of October 18, 1949, between the McCulloughs and Myers, et al., was entered into in Illinois. It provided, inter alia, that a direct royalty payment was to be made to Ar-Tik based on the amount of mix sold in Pennsylvania and that this obligation would not terminate with the expiration of the patent on the freezing machines. The law of Illinois the place of contracting, will govern the rights and liabilities of the parties under this contract, Restatement, Conflict of Laws, § 332(f). Pennsylvania is the place of performance and the present

crucial contract under which Ar-Tik claims in this case and that under that law Ar-Tik had a right to sue as a third party beneficiary.

case concerns itself with matters of performance. General doctrine would support the proposition that the law of Pennsylvania should govern this case, Restatement, Conflict of Laws, § 358(c); Goodrich, Conflict of Laws, 343 (3rd Ed. 1949). But this Court is hesitant to apply the general rule when it appears to run contrary to the apparent intention of the parties. The point at which one rule operates to the exclusion of the other is more a matter of common sense than logic, Restatement, Conflict of Laws, § 358(b) Comment. All the agreements made by the McCulloughs were executed in Illinois, the locale of their business operation. Therefore it is reasonable to assume that the McCulloughs contracted with a view towards having the law of Illinois govern the totality of their legal relations with other contracting parties. Particularly is this evident upon consideration of the general franchising plan. The ultimate extent of the plan was national in scope. In order to achieve uniformity and certainty of result, it is reasonable to assume that the parties intended that the law of one jurisdiction, i. e. Illinois, would govern the legal extent of the various transactions, Lorenzen, "Validity and Effects of Contracts in the Conflict of Laws", 31 Yale L.J. 53 (1921).

"The defendant contends that the plaintiff may not sue to enforce the provisions of the contract of October 18, 1949. It has long been the rule in Illinois that a promise to pay a sum to a third person not a party to the contract may be enforced by the third person, Webster v. Fleming, 178 Ill. 140, 52 N.E. 975 (1899). If the contract confers a direct benefit upon the third person then he may sue for its breach, Cherry v. Aetna Casualty & Surety Co., 372 Ill. 534, 25 N.E.2d 11 (1939); also see Reconstruction Finance Corporation v. Bairstow, 140 F.2d 353 (7th Cir. 1944). It cannot be doubted that the contract of October 18, 1949 conferred a direct benefit upon the plaintiff since the language expressly provides, '3. Pay direct, or cause to be paid direct to Ar-Tik Systems, Inc., * * the sum of four cents a gallon on all mix sold * * * in Pennsylvania'. Accordingly, the plaintiff, a direct beneficiary, may sue for a breach of the contract of October 18, 1949, 2 Williston, Contracts § 399 (1936 Ed.).

"The defendant has denominated the agreement of October 18, 1949 a patent license agreement and thereby raises the defense of patent misuse, Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488 [62 S.Ct. 402, 86 L.Ed. 363] (1942); Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661 [64 S.Ct. 268, 88 L.Ed. 376] (1944); E. R. Squibb & Sons v. Chemical Foundation, Inc., 93 F.2d 475 (2nd Cir. 1937); American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769 (3rd Cir. 1959). The defendant's theory is inapposite because this Court characterizes the agreement as a franchise agreement or a trademark license contract and not a patent license agreement, 3 Callman, Unfair Competition and Trademarks 1007 (2nd Ed. 1950).

"The agreement between Ar-Tik and H. A. McCullough which was executed on September 7, 1946 was a patent license agreement. By virtue of this agreement, the McCulloughs acquired the right to use and manufacture the patent freezer machine, Ar-Tik Systems, Inc. v. McCullough, 133 F.Supp. 807 (S.D.Ill.1955). When the McCulloughs subsequently executed the contract of October 18, 1949 they granted more than a mere patent license. They granted the exclusive right to develop certain parts of Pennsylvania for the operation of Dairy Queen stores. In Medd v. Boyd Wagner, Inc., 132 F. Supp. 399, 407 (N.D.Ohio 1955), the court, in considering the McCulloughs' business purpose, said:

" 'The fact that he (H. S. McCullough) licensed the use of the name in connection with a license of the patent right renders his position much stronger. He was not entering into a mere naked license agreement.'

As part of this overall purpose, the defendants were under a duty, inter alia, to use the patented freezers. However this duty was entirely incidental to the main purpose of the contract. By necessity this situation is in accordance with the law of trademarks as well as efficient business practices. Morse Starett Products Co. v. Steccone, 86 F.Supp. 796 (N.D.Cal.1949); Brosious v. Pepsi Cola Co., 155 F.2d 99 (3rd Cir. 1946); Manichewitz Food Products v. Rosenberg, 9 F.R.D. 115 (E.D.Pa.1949). The McCulloughs were merely controlling the type of machine used in Dairy Queen stores. This is exactly similar to a like control of the mix, the physical characteristics, and the standards of the stores which were called for by the agreement of October 19, 1949. Accordingly, there is no question of patent misuse since the McCulloughs could have entered into the same restrictive agreement with the de-

It was further held that the agreement of October 18, 1949 was a franchise agreement or trademark license and not a patent license agreement so that the defense theory of patent misuse raised by the defendant was found to be inapposite.

The trial court also held that the McCulloughs were merely controlling the type of machines used in Dairy Queen's stores, similar to like control of the mix, the physical characteristics and other standards of the stores; that Ar-Tik's claim was not "the product of a thinly veiled technique to create a patent monopoly by indirection" and that the four cent figure can not be termed a royalty payment for Ar-Tik's patent.

Orders were accordingly entered by the court in favor of Ar-Tik and against Dairy Queen, Inc. in the sums of $86,169.08 and $32,424.99, representing principal and interest due from Dairy Queen, Inc. and dismissing the counterclaim of the latter. As a result this appeal was taken.

Jurisdiction of the court was properly found to be grounded on diversity of citizenship. 28 U.S.C.A. § 1332.

The suit is an incident in the phenomenal development of the merchandising of this frozen dessert or soft ice cream product to the public by literally thousands of individual stores all over the country under practically uniform methods within a period of less than 23 years.[5] It had its inception when on July 31, 1939 Harry M. Oltz agreed to grant a license to H. A. McCullough to manufacture an ice cream freezer on which Oltz held United States Patent No. 2080971 in 23 states west of the Mississippi River, known as the "Western Agreement". McCullough was to furnish the mix to make the product and to pay Oltz a royalty of from four cents to one cent per gallon on all the mix furnished to the machines depending upon the number made and put into operation until the expiration of the patent on May 18, 1954, at which the manufac-

---

fendant even if there had been no patent on the freezer at any time.

"The plaintiff's claim is not the product of a thinly veiled technique to create a patent monopoly by indirection. The plaintiff is not forcing the defendant to do anything in relation to the patent. All the plaintiff desires to do is to collect four cents per gallon from the defendant as assignee of the contract of October 19, 1949. This claim is entirely independent of any patent rights. The facts disclose that two cents of the four cent gallonage payment was to be returned to McCullough. Therefore the four cent figure cannot be termed a royalty payment for Ar-Tik's patent. Further, if the McCulloughs had desired to receive the four cent royalty they could have exacted it as part of the consideration from the defendant's predecessors. It would be unreasonable to raise the defense of patent misuse in such a case. A fortiori, the McCulloughs, instead of having the payment enure to themselves, could have obligated the defendant, as final assignee, to pay the four cent royalty to the plaintiff.

"The defendant's obligation to make the royalty payments is coextensive with the enjoyment of benefits under the contract, Warner-Lambert Pharmaceutical Co. v. [John J.] Reynolds [Inc.], 178 F.Supp. 655 (S.D.N.Y.1959). The duration of the obligation to make royalty payments was not specifically set out by the parties except for the provision relating to the patent expiration. In the absence of a provision calling for an exact termination date or a perpetual payment, it is reasonable to interpret the contract as one calling for payment so long as benefits accrue under the contract. The plaintiff's contention is precisely on point (plaintiff's brief, page 20);

" '* * * defendant is clearly obligated to continue payments to plaintiff so long as it continues to reap the benefits from the use of the Dairy Queen name. Conversely, should defendant discontinue using and enjoying the name, plaintiff need not and does not contend that defendant would be under any further obligation to make the 4¢ per gallon royalty payments.'

"There is no stated public policy which would militate against the enforcement of such an agreement. In Ar-Tik Systems, Inc. v. McCullough, 133 F.Supp. 807, 810 (S.D.Ill.1955), the present plaintiff sued the McCulloughs for breach of a contract calling for royalty payments regardless of the expiration of the patent. * * * *"

5. For details of the development of the business see Medd v. Boyd Wagner, Inc.,

turing rights were to end, but he was to be permitted to keep his machines and operate them independently paying the royalty as usual.[6]

Evidently the parties considered the exploitation of the "Western Agreement" successful and satisfactory to them for on September 7, 1946, Ar-Tik, a corporation which Oltz had formed and to which he had assigned his interests entered into an agreement with H. A. McCullough granting the exclusive right to manufacture, use and sell machines under the same patent in many states east of the Mississippi River including Pennsylvania. The contract, known as the "Eastern Agreement", was to terminate on May 18, 1954, but if patents for improvements were secured it was to run for the life of the improvements. McCullough agreed to pay Ar-Tik $10,000 in cash and 60 percent of sums received by him by reason of territorial rights he, McCullough, might grant to third parties until $102,000 was paid to Ar-Tik.

Paragraphs 4 and 5 of the agreement read:

"4. All sublicenses granted by Second Party [McCullough] shall contain a provision obligating the sublicensee to pay to Ar-Tik Systems, Incorporated, the sum of Two Cents (.02¢) per gallon on all mix

used in the machines built during said patent number, said royalty to continue during the life of the machines regardless of the expiration of said patent. * * * "

"5. Copies of all sublicenses granted by Second Party shall be promptly furnished to Ar-Tik Systems, Incorporated. All machines manufactured shall bear a serial number and Ar-Tik Systems, Incorporated, shall be kept informed at all times of the location of all machines manufactured by Second Party or his sublicensees."

A supplement to the agreement was entered into on February 20, 1953, as of September 7, 1946, by Ar-Tik and H. F. McCullough acting for McCullough's Dairy Queen, which substituted the following for paragraph 4 of the original agreement:

"4. All sub-contracts issued by Second Party [McCullough's Dairy Queen] shall contain a provision obligating the sub-contractor, successors, and assigns, to pay to AR-TIK SYSTEMS, INC., the sum of Four Cents (.04¢) per gallon on all mix used in machines built under said patent number, said payments to continue during the life of the machines regardless of the expiration of any

---

132 F.Supp. 399 (N.D.Ohio 1955) and Ar-Tik Systems v. McCullough, 133 F. Supp. 807 (S.D.Ill.1955).

6. Paragraph No. 6 of the agreement of July 31, 1939 reads:
"I [H. A. McCullough] am to furnish the mix to make the product, whatever it is, and I am to pay you [Harry M. Oltz] as royalty 4¢ per gallon on all the mix furnished to the first 10 machines, 2¢ per gallon on the next 20 machines. I would then have 30 machines in operation. From that time on to the termination of this agreement, your royalty would be 1¢ per gallon on all machines then in operation, and would continue to be 1¢ per gallon on all machines made thereafter. We are to consider this contract in force until the expiration of your patent, which I understand to be May 18, 1954. At that time my manufacturing rights are to end, but I am to be allowed to keep my machines, and op-

erate them indefinitely within my allotted territory. Your royalty is to continue as usual."

By a rider dated September 7, 1946, entered into between Ar-Tik and H. A. McCullough the above paragraph 6 was amended to read as follows:

"I am to pay you as royalty the sum of Four Cents (.04¢) per gallon on all mix used in machines built under Patent No. 2080971 operated within the above described territory. We are to consider this contract in force until the expiration of your patent which I understand to be May 18, 1954. At that time my manufacturing rights are to end, but I am to be allowed to keep my machines and operate them indefinitely within my allotted territory. Your royalty is to continue as usual. In the event improvements are made on said patent, then this agreement shall be extended during the life of such improvements."

patents. * * * The said payments in amount of Four Cents (.04¢) per gallon shall be divided equally between the parties hereto and First Party shall remit to the Second Party the amount of Two Cents (.02¢) per gallon each month as collected from the sub-contractor."

Subsequently H. A. McCullough assigned his rights under the agreement of September 7, 1946 to a partnership consisting of him, H. F. McCullough and J. F. McCullough, under the name of McCullough's Dairy Queen.

On October 18, 1949, McCullough's Dairy Queen entered into an agreement with Burton F. Myers, Robert J. Rydeen, M. E. Montgomery and Howard Dale, trading under the name of Dairy Queen of Pennsylvania. The agreement recited that McCullough's Dairy Queen had registered the trademark "Dairy Queen" with the State of Pennsylvania; that Ar-Tik was the owner of Patent No. 2080971 on the Freezing and Dispensing Machine; and that "the rights to manufacture, use, sell, and/or Sub-contract to other parties under said Patent were granted to H. A. McCullough." It provided that McCullough's Dairy Queen should convey to the four individuals constituting Dairy Queen of Pennsylvania "an exclusive right to develop the certain territory of the State of Pennsylvania for the restricted conduct of Dairy Queen Stores, * * *." [7] Among the conditions assumed by Dairy Queen of Pennsylvania was the payment "direct to McCullough's Dairy Queen * * * of $150,000 in cash" of which $1,000 was payable at once and the balance as follows:

"* * * 50% forthwith of all amounts of sales of franchises or Territorial rights made by Second Party [Dairy Queen of Pennsylvania] under contracts sold by Sec-

ond Party, and in addition, 50% of the sale value of all said franchise or territorial rights used by Second Party."

A minimum payment for each year was fixed in the sum of $18,625 until the full balance of $149,000 was liquidated.

In paragraph 3 of said agreement Dairy Queen of Pennsylvania also agreed to:

"Pay direct, or cause to be paid direct, to Ar-Tik Systems, Inc., 1801 NW 17th Avenue, Miami, Florida, the sum of four cents a gallon on all mix used or sold through any and all Dairy Queen Stores and/or said Freezing and Dispensing Machines operated in Pennsylvania by Second Party and/or their Subcontractors, from the beginning of operations hereof, in the nature of a royalty regardless of the expiration of patent on said machines. * * *"

In addition Dairy Queen of Pennsylvania covenanted to keep records and maintain methods of store operations in conformity with regulations established by McCullough's Dairy Queen in agreements with Dairy Queen operators then in force in other states.

Dairy Queen of Pennsylvania also specifically agreed as follows:

"7. That the Second Party [Dairy Queen of Pennsylvania] or any others, shall not sell or offer for sale any other frozen or semi-frozen dairy product, use any other type or make of freezer, or sell any of the said machines, move any of the said machines purchased through the First Party outside of the State of Pennsylvania for the purpose of operating them, without first obtaining the written consent and approval of the First Party within ten days after it is completed and signed.

7. The following areas in Pennsylvania were excluded from the agreement: Allegheny County and Cities of Greenburg, Uniontown, Washington, Pottstown, Phoenix-ville, Bethlehem, West Chester, Coatsville, Morristown, Chester, Reading, Allentown and Easton.

"8. That Second Party shall order through First Party all of said machines needed for said development, at the manufacturers selling price f. o. b. factory. Said prices may vary from time to time dependent upon costs of material and labor. First Party does not guarantee prices, delivery dates, or furnish parts or labor free of charge on the said machines. Second Party shall take up with manufacturer the matter of any necessary adjustments for unsatisfactory or defective parts of machines. First Party or Second Party shall not be required to assume responsibility for defending Patent Number 2080971, as such defense is an obligation of Ar-Tik Systems, Inc."

In an agreement entered into on November 29, 1949, Messrs. Myers, Rydeen, Montgomery and Dale, doing business as Dairy Queen of Pennsylvania, conveyed to Edward Thompson and C. D. Martin, Jr., all of their rights under the contract of October 18, 1949, with McCullough's Dairy Queen and the right to convey all of their interest to a corporation which they might organize subject to:

"(b) Performance by Second Party [Thompson and Martin] of all of the obligations of the First Party [Myers, Rydeen, Montgomery and Dale, doing business as Dairy Queen of Pennsylvania] under the McCullough Contract.

"(c) Payment by Second Party of all sums due to Ar-Tik Systems, Inc. and to McCullough's Dairy Queen under the terms of the McCullough Contract.

"(d) Payment to First Party, on demand, of the sum of 8,000—in cash plus 10¢ per gallon of liquid mix (or equivalent in powdered mix) processed through all machines for the manufacture of the product known as 'Dairy Queen' in the territory covered by the McCullough Contract, payable on or before the 10th day of each month for the previous calendar month, commencing January 10, 1950."

On December 23, 1949, Messrs. Martin and Thompson made an assignment of all their rights under their agreement of November 29, 1949 to a corporation they had organized under the laws of the State of Washington known as Dairy Queen, Inc., the defendant herein, in consideration whereof it agreed as follows:

"Dairy Queen, Inc. hereby accepts the assignment of said agreement and does hereby assume and undertake all of the obligations and duties imposed upon C. D. Martin, Jr. and Edward Thompson by the terms of said agreement, and in accordance with the terms thereof the said C. D. Martin, Jr. and Edward Thompson * * * shall have no further personal liability under said agreement."

Dairy Queen, Inc., in turn, executed franchise agreements with nearly 100 storekeepers in the territory it acquired in which it was described as the "owner of the exclusive right and license to the use of Dairy Queen Freezers manufactured under Patent No. 2080971 and the right to the use of the trade name Dairy Queen in the territory * * * in the State of Pennsylvania." Each franchise holder was granted the right to make and sell a frozen food under the name Dairy Queen. Among other obligations undertaken by the franchise holders was the obligation to pay a stated amount for the franchise in cash or installments and in addition to pay a royalty of 29 cents per gallon on all mix used in the freezers as long as they were in use or operation.

The franchise agreements contained the provision, "It is understood and agreed that Ar-Tik Systems, Inc. own the patent, (No. 2080971). * * *" Each franchise holder also agreed that his records of the conduct of the business, the serial numbers and location of all freezers, and all the mix used and processed by him would be held open

to the examination and inspection of Ar-Tik among others. These provisions are contained in the forms of franchise agreement in use until the year 1955, but mention of Ar-Tik and Patent No. 2080971 is not found in the form of franchise used in 1955 and thereafter.

Preliminarily we are confronted with the contention of the defendant that the conflict of laws rule of Pennsylvania dictates that, where the contract is executed in one state and is to be performed in another, the law of the place of performance is controlling; that Pennsylvania is the place of performance of the contract in this case and that under the Pennsylvania law applicable to the third party beneficiaries Ar-Tik may not recover since it is neither a donee nor creditor beneficiary and hence Ar-Tik has no standing to sue.

The District Court held that the law of Illinois was applicable and that the plaintiff, as a direct beneficiary, had standing to sue for a breach of the contract of October 18, 1949.

The Restatement, Contracts § 133, defines a creditor beneficiary as follows:

"(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, \* \* \*

\* \* \* \* \* \*

"(b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performances of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, or a right of the beneficiary against the promisee which has been barred by the Statute of Limitations or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds."

The performance of the royalty provisions of paragraph 3 of the contract of October 18, 1949 satisfied "an actual or supposed or asserted duty of the promisee [McCullough] to the beneficiary [Ar-Tik]."

Pennsylvania has adopted Restatement, Contracts § 133. Commonwealth v. Great American Indemnity Co., 312 Pa. 183, 167 A. 793 (1933); McClelland v. New Amsterdam Casualty Co., 322 Pa. 429, 185 A. 198 (1936).

 In paragraph 4 of the contract of September 7, 1946, Ar-Tik required McCullough to provide for the payment to it of a royalty of two cents per gallon of mix used in the patented machines by all sublicensees. This amount was increased to four cents by a supplemental contract as heretofore noted. It was to satisfy this duty that McCullough required his assignees to pay Ar-Tik the four cents royalty. Contrary to the contention of the defendant, it seems clear that Ar-Tik was a creditor beneficiary under the law of Pennsylvania. Burke v. North Huntingdon Twp., 390 Pa. 588, 136 A.2d 310 (1957); Spires v. Hanover Fire Insurance Co., 364 Pa. 52, 70 A.2d 828 (1950). Since the law of Illinois [8] and the law of Pennsylvania are alike in giving Ar-Tik standing to sue on the instant contract it made no difference which law the District Court applied.

Under the agreement of October 18, 1949, Myers et al. acquired from McCullough's Dairy Queen (1) the right to use the freezer manufactured under United States Patent No. 2080971 and (2) the exclusive right to develop certain parts of Pennsylvania for the operation of Dairy Queen Stores. A separate consideration is provided for each of these rights. As stated before a royalty of four cents payable to Ar-Tik directly was set for the use of the patented freezer and cash and installment payments to McCullough's Dairy Queen were fixed for the right to develop the territory with the use of the name Dairy Queen.[9]

8. See Reconstruction Finance Corporation v. Bairstow, 140 F.2d 353 (7 Cir. 1944) and Illinois cases cited therein.

9. If any clarification were needed concerning the intent of the parties it was supplied by the testimony of H. F. McCullough, as follows:

On November 29, 1949, a little more than a month after they had acquired it, Myers et al. assigned the contract to Thompson and Martin, who, in turn, on December 23, 1949, in less than a month, transferred it to their corporation, the defendant, Dairy Queen, Inc.

Thus, defendant, Dairy Queen, Inc., assumed the obligation to pay directly to Ar-Tik the four cent royalty in the pattern established in the contract between Ar-Tik and McCullough of September 7, 1946. Indeed, Ar-Tik, admittedly not a signatory to the contract of October 18, 1949, bases its present claim as a named third party beneficiary under that contract.

The defendant, Dairy Queen, Inc., continued to pay the four cent royalty directly to Ar-Tik through November 1954, some six months after the expiration of the patent. It then refused to make further payments although the mix continued to be used in the patented freezers in Dairy Queen stores in Pennsylvania by its franchise holders. However, the defendant continued to make payments on account of its separate obligation to the McCulloughs arising under the contract of October 18, 1949. It also continued to make payments to Messrs. Myers et al. as required by the contract of November 29, 1949.

"By Mr. Egnal:
"Q. I am going to read to you from the testimony which you gave, and I am going to ask you whether the statements you made as recorded were correct or not.
* * * * *
"By Mr. Egnal:
* * * * *
"Q. Let me try it again. In other words, in all the territories where you granted franchises for the use of the trade name, you also gave the operator the right to use this Arctic freezer; is that correct?
"A. That is correct.
* * * * *
"Q. And in all cases you also arranged for Arctic to get 4 cents as their consideration for the use of the freezer; is that correct?

The defendant justifies its termination of payments to Ar-Tik on the ground that the provision of the contract of October 18, 1949, requiring payments to Ar-Tik of royalties beyond the expiration date of the patent, is unenforceable because it constitutes a misuse of the patent.

Early cases do not sustain that position. In E. R. Squibb & Sons v. Chemical Foundation, 93 F.2d 475, 477 (2 Cir. 1937) it was said:

"There is a presumption that royalties are not to be paid after the expiration of a patent; if the intention is to have them continue longer, the parties should phrase their contract in language from which such intention may fairly be inferred."

The Court of Appeals for the Second Circuit cited as authority two earlier cases in that circuit: Sproull v. Pratt & Whitney Co., 108 F. 963 (2 Cir. 1901) and Pressed Steel Car Co. v. Union Pac. R. Co., 270 F. 518 (2 Cir. 1920). It should be noted, however, that in all three cases the suggestions that royalties could be made payable on expired patents were dicta because in each of the three cases it was found that the royalty contract did not provide for such payment. And in Sproull, the earliest of the Second Circuit cases, no authority is cited to support the dictum there stated.[10]

"A. That is correct.
"Q. As far as you were concerned, you made your own deal, either in cash or instalments for the right that you gave to use the trade name Dairy Queen?
"A. That is correct."

10. One or more of these Second Circuit cases have been cited in a number of later cases. Six Star Lubricants Co. v. Morehouse, 101 Colo. 491, 74 P.2d 1239 (1938); Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co., 44 F.Supp. 396 (S.D.N.Y.1939); H-P-M Development Corp. v. Watson-Stillman Co., 71 F.Supp. 906 (D.N.J.1947); Bettis Rubber Co. v. Kleaner, 104 Cal.App.2d 821, 233 P.2d 82 (Cal.Dist.Ct. of Appeal 1951); Tate v. Lewis, 127 F.Supp. 105 (D.Mass.1954); Starke v. Manufacturer's National Bank of Detroit, 174 F.Supp. 882 (D.Mich.1959), affirmed 283 F.2d 117

In Walker, Patents, p. 456, (1961 Supp. to Vol. II Deller's ed.); Ellis Patent Licenses, Sec. 109, p. 128 (3rd ed. Deller, 1958) and 69 C.J.S. Patents § 262, p. 802, there are statements to the effect that an agreement to pay royalties after a patent has expired may be valid and binding.[11] The authorities cited are either the Second Circuit or other cases noted heretofore.

In Ar-Tik Systems v. McCullough, 133 F.Supp. 807 (S.D.Ill.1955) the present plaintiff sued the McCulloughs for breach of the "Western Agreement" of July 31, 1939, which they acquired by assignment, calling for royalty payments regardless of the expiration of the patent. The contract upon which suit was brought granted the McCulloughs the right to manufacture, use and sell ice cream freezing and dispensing machines and provided for the payment of royalties on all machines manufactured under the agreement and used in the business developed by the licensee. The royalty was four cents per gallon on all mix processed through the machines. The court without citing any authority held that there was nothing illegal or contrary to public policy in the agreement. The court made no reference to patent misuse in its opinion.[12]

---

(6 Cir. 1960); In all of the cited cases except Six Star any opinion on the issue here involved was dictum. In Six Star the Supreme Court of Colorado reversed a judgment for the plaintiff on the ground that it failed to establish the use of the patented formulae or any patented formulae or any patented modification. It remanded the case for a new trial. The court went on, however, to express its views on the contention made by the appellant that a contract provision requiring the payment of royalties on an expired patent was invalid. It stated:

"There is no legal inhibition against a party contracting to pay royalty on a patented article or formula for a period beyond the date of the expiration of the patents." 74 P.2d at p. 1242.

It instructed the lower court that under the facts of that case the question of whether the contract required royalty payments on the expired patent was for the jury. It cited Pressed Steel Car. Co. v. Union P. R. Co., supra and Mitchell v. Hawley, 16 Wall. 544, 83 U.S. 544, 21 L.Ed. 322 (1872) but the instant question does not appear to have been raised in the Mitchell case.

11. The English rule would also seem to permit such an agreement. Siemens v. Taylor, 9 R.P.C. 393 (1892); Terrell and Shelley, Patents, p. 234 (10th ed. 1961 Shelley). In Siemens the patentee granted a license for the use of several patents. The licensee agreed to pay royalties for the use of any of the patents until the expiration of all of the patents. The court, in dictum, said that royalties must be paid for the use of any of the patents so long as any of the patents were subsisting but it held that the licensee was not using any of the patented inventions.

12. Another case related by background to the instant litigation is Medd v. Boyd Wagner, Inc., 132 F.Supp. 399 (N.D.Ohio 1955). Medd et al. were partners doing business as Dairy Stores of Ohio. They sued Boyd Wagner, Inc. and individual defendants. The Medds alleged that on December 30, 1946 they secured from H. A. McCullough the exclusive right to the use of United States Patent 2080971 in Ohio for the life of the patent and an assignment of McCullough's rights to the trade name Dairy Queen of Ohio. They then proceeded to exploit the name Dairy Queen of Ohio in conjunction with the phrase they had coined "The Cone with the Curl on Top". On July 20, 1948, the Medds entered into a distant franchise agreement with Boyd Wagner, Inc., giving it exclusive right to the patent and the name in 21 counties of Ohio which rights were to expire with the patent on May 18, 1954. Boyd Wagner, Inc. subsequently entered into a number of franchise agreements by which it licensed store operators (co-defendants in the case with Boyd Wagner, Inc.) to use the patent and trade name which likewise expired with the patent on May 18, 1954. The defendants announced that they would continue to use the name "Dairy Queen" and the phrase, but that they would refuse to pay the Medds any royalties after May 18, 1954.

The Medds brought their action to restrain the unauthorized use of the trade name Dairy Queen and of the trade phrase.

The defendants contended that after the expiration of the patent, property in the name became lodged in the defendants and that rights of the Medds to the trade name and phrase ceased to exist.

Apparently the first case which questioned the dictum in Squibb is Baker-Cammack Hosiery Mills v. Davis Co., 181 F.2d 550 (4 Cir. 1950). There the court stated:

"The Davis Company in the new offer also eliminated the provision as to the expiration date of the license. Theretofore in order to justify its requirement that a license taken by a manufacturer should last until the expiration of the youngest patent in the group, it had relied upon the rule announced in such a case as E. R. Squibb & Sons v. Chemical Foundation, 2 Cir., 93 F.2d 475, 477, that if the contract between the parties expressly so provides, royalty payments may be collected after the expiration of the patent. Such a provision, however, might easily lend itself to an unreasonable restraint of trade by extending patents beyond their legal limit; but it has been eliminated in the pending case and need no longer be considered." 181 F.2d at p. 573.

The New York Court of Appeals has also questioned the dictum in Squibb in April Productions v. G. Schirmer, Inc., 308 N.Y. 366, 126 N.E.2d 283, 69 A.L.R. 2d 1305 (1955). There the court held that where a licensee had copyrighted a composition in its own name in accordance with the custom in the music publication business and the contract provided for royalties to the licensor, who was the assignee of the composer, for each copy sold, the payment of royalties was not required after the expiration of the copyright. The court said:

"Our reading of the contract in suit—as imposing no obligation to pay royalties after the expiration of the underlying copyrights—is reinforced by an established rule of

construction applied in the analogous field of patent royalty agreements. See E. R. Squibb & Sons v. Chemical Foundation, 2 Cir., 93 F.2d 475, 477; Tate v. Lewis, D.C., 127 F.Supp. 105; Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co., D.C., 44 F.Supp. 396. 'There is a presumption that royalties are not to be paid after the expiration of a patent; if the intention is to have them continue longer, the parties should phrase their contract in language from which such intention may fairly be inferred.' E. R. Squibb & Sons v. Chemical Foundation, supra, 93 F.2d 475, 477. In point of fact, an agreement to pay royalties on the manufacture of a patented article 'after the patent expires, whatever the legal device employed,' may be unenforcible as contrary to public policy. Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 256, 66 S.Ct. 101, 104, 90 L.Ed. 47, 51. For our purposes, the same rules should apply to royalty agreements involving copyrighted literary property, inasmuch as both forms of property—patent and copyright—may be enjoyed for only a limited period of time under the United States Constitution, art. I, § 8, cl. 8." 126 N.E.2d at p. 287.

Further doubt is cast on the vitality of the rule set forth in Squibb, in Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., 178 F.Supp. 655 (S.D.N.Y. 1959). There a contract calling for the indefinite payment of royalties for the use of a secret drug formula was upheld. The formula, however, was unpatented. In discussing the instant issue the court said:

"Paralleling the concept that the licensing of a patent or copyright

The court concluded from the evidence that the trade name and phrase were not associated with the patent freezer machine and there was no attempt to extend the life of the patent by use of the trade name and phrase. It enjoined the defendant from using any of them.

The marked distinction between that case and this is that it revolved completely around the ownership of the trade name and trade phrase. Ar-Tik did not appear in the suit and the issue of the payment to it of royalties on the freezer was not raised.

contracts only for the statutory monopoly granted in such cases is the concept not so frequently expressed that public policy may require a termination of the obligation to pay when the patent or copyright term is ended. * * *" 178 F. Supp. at p. 665.

As authority for this statement the court cited Scott Paper Co. v. Marcalus Co., 326 U.S. 249, 66 S.Ct. 101 (1945).

In the Scott Paper case an inventor assigned the patent to his employer. He left that employment to start his own business, where he allegedly produced an infringing device. In a suit brought by his former employer he defended on the ground that the patent he had assigned had been copied from an expired patent. In reply the employer urged that the defendant was estopped to assert the invalidity of the patent because he had assigned it for value.

The Court held that the assignor of a patent was not estopped from denying its validity in the assignee's action for infringement where the accused device was that of a prior and expired patent since the patent laws precluded the assignor from estopping himself from enjoying rights which it was the policy of the patent laws to free from all restrictions. In stating the rationale for its holding the Court said in words which appear applicable to the instant issue:

"The aim of the patent laws is not only that members of the public shall be free to manufacture the product or employ the process disclosed by the expired patent, but also that the consuming public at large shall receive the benefits of the unrestricted exploitation, by others, of its disclosures. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 117–120 [59 S.Ct. 109, 83 L.Ed. 73]. If a manufacturer or user could restrict himself, by express contract, or by any action which would give rise to an 'estoppel', from using the invention of an expired patent, he would deprive himself and the consuming public of the advantage to be derived from his free use of the disclosures. The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. Hence any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws. And for the same reason a stranger, such as respondent, Marcalus, cannot, by securing and assigning a patent on the invention of the expired Inman patent, confer on petitioner any right to deprive the public of the benefits of the free use of the invention for which the public has paid by the grant of a limited monopoly.

"By the force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly. Hence we have held that the patentee may not exclude the public from participating in that good will or secure, to any extent, a continuation of his monopoly by resorting to the trademark law and registering as a trademark any particular descriptive matter appearing in the specifications, drawings or claims of the expired patent, whether or not such matter describes essential elements of the inventions or claims. Kellogg Co. v. National Biscuit Co., supra, 117–120 [59 S.Ct. 109]; Singer Manufacturing Co. v. June Manufacturing Co., 163 U.S. 169, 185 [16 S.Ct. 1002, 41 L.Ed. 118].

*"It is thus apparent that the patent laws preclude the patentee of an expired patent and all others including petitioner from recapturing any part of the former patent monopoly; for those laws dedicate to all the public the ideas and inventions em-*

*bodied in an expired patent. They do not contemplate that anyone by contract or any form of private arrangement may withhold from the public the use of an invention for which the public has paid by its grant of a monopoly and which has been appropriated to the use of all. The rights in the invention are then no longer subject to private barter, sale, or waiver.* Cf. Phillips Co. v. Grand Trunk R. Co., 236 U.S. 662 [35 S.Ct. 444, 59 L.Ed. 774]; Midstate Horticultural Co. v. Pennsylvania R. Co., 320 U.S. 356, 361 [64 S.Ct. 128, 88 L.Ed. 96]; Brooklyn [Savings] Bank v. O'Neil, 324 U.S. 697, 704 [65 S.Ct. 895, 89 L.Ed. 1296]. It follows that the patent laws preclude the petitioner assignee from invoking the doctrine of estoppel, as a means of continuing as against respondent, his assignor, the benefit of an expired monopoly, and they preclude the assignor from estopping himself from enjoying rights which it is the policy of the patent laws to free from all restrictions. For no more than private contract can estoppel be the means of successfully avoiding the requirements of legislation enacted for the protection of a public interest. * * *" (Emphasis supplied.) 326 U.S. at pp. 255–257, 66 S.Ct. at pp. 104, 105.

This court expressed its views on the present question in American Securit Co. v. Shatterproof Glass Corp., 3 Cir., 268 F.2d 769 (1959). It held invalid a "package" licensing agreement wherein the licensee was obliged to take a license on a group of patents even if only one was wanted, stating:

"We conclude also, and quite apart from all of the foregoing, that Paragraph 8(a) of Securit's Standard Licensing Agreement which provides that that agreement shall continue 'in full force and effect to the expiration of the last to expire of any' of Securit's patents set out in 'Schedule A' constitutes a patent misuse *for*

*it extends the payment of royalties of patents under patents which may expire to the expiration date of that patent most recently granted to Securit.* * * *" (Emphasis supplied and footnotes omitted.) 268 F.2d at p. 777.

Oltz, Ar-Tik's assignor, sought to bind H. A. McCullough directly in the original contract of July 31, 1939, the "Western Agreement", to the payment of royalties after the expiration of his patent. In its contract with the McCulloughs of September 7, 1946, Ar-Tik required them to obligate themselves and all sub-licensees to pay it a royalty beyond the expiration of its patent.

The McCulloughs dutifully met this requirement by imposing upon their licensees in paragraph 3 of the agreement of October 18, 1949, the obligation of paying Ar-Tik directly the four cents per gallon royalty. As noted before, subsequent assignments sought to carry the same obligation to the defendant. The fact that Ar-Tik was willing to divide its royalties with McCullough makes them no less tribute for the use of the patent license.

There is no evidence in this case to support any claim that Ar-Tik was vested with any ownership or interest in the trade name Dairy Queen, in Pennsylvania. The name was created by McCullough and has been exploited in Pennsylvania by the defendant, Dairy Queen, Inc., under the title it acquired stemming originally from McCullough. Ar-Tik's royalty as contracted for by the McCulloughs and their assigns down to the defendant was solely for the use of its patent.

In this view we differ from the District Court in its Findings of Fact, Nos. 6 and 7, supra, and must hold as clearly erroneous its determination that under the contract of October 18, 1949 the assignees of the McCulloughs obligated themselves to pay Ar-Tik a royalty of four cents per gallon of mix used, as consideration, inter alia, for the grant to develop the Pennsylvania territory for

the restricted conduct of the operation of Dairy Queen stores. As stated heretofore a separate consideration is set forth in paragraph 4 of the agreement of October 18, 1949, supra, for this right. The obligation to pay the four cent royalty is found in paragraph 3 of the said agreement and is solely for the use of the patented machines.

■ After the expiration of Patent No. 2080971 on May 18, 1954, the grant of patent monopoly was spent. An attempt to extend that monopoly by the exaction of royalties thereafter was unenforceable.[13] Such action clearly appears to be interdicted by Scott Paper Co. v. Marcalus Co., supra, and American Securit Co. v. Shatterproof Glass Corp., supra.

Dairy Queen, Inc. further contends that there was misuse of the patent in the restrictions contained in paragraph 7 of the agreement of October 18, 1949, between the McCulloughs and Myers, et al., wherein it was provided that neither the latter nor any others shall "use any other type or make of freezer." It is urged in this connection that the effect of the restriction "was to force the defendant and its sublicensees to use *only* the patented freezer and thus free [it] * * * from competition with freezers not coming under the patent." In view of our earlier holding as to the unenforceability of the agreements for royalties after the expiration of the patent it is unnecessary to rule on the issue of further misuse.

■ Ar-Tik also urges that the defendant "by its own conduct and interpretation of the contract * * * is precluded from raising the defenses here asserted." It contends that Dairy Queen is estopped from asserting that the royalty to Ar-Tik is tied to a patent, and, so interpreted, is illegal, because it continued to pay the royalty to Ar-Tik from 1950 until November 1954, well after the expiration of the patent. It also urges that its conduct is inconsistent with its present interpretation of its contractual obligation in that it has entered into many sublicenses at substantial profit incorporating the same royalty structure which it now assails including the same type of restrictive covenants and additional ones; and that it has continued to pay its "separate" obligation to the McCulloughs and to its assignors who conveyed nothing more than their rights under the contract of October 18, 1949. Ar-Tik further submits that Dairy Queen, Inc. has taken and continues to take all the benefits of the 1949 contract and has recognized all of its obligations thereunder except the continued duty to Ar-Tik, thereby manifesting by its conduct that it has interpreted the contract as legal and binding and that it may not now contradict itself by asserting that it is illegal and unenforceable.

None of the acts of the defendant, however inconsistent with the position it has taken in this case, can preclude it from asserting the invalidity of the requirement to pay royalties after the expiration of the freezer patent in view of the reasoning and holding in Scott Paper Co. v. Marcalus, supra.

The continued payments by defendant to its assignors and the McCulloughs under its obligations to them only indicates the recognition of its duty to pay for the right to develop the described territory for its operation of Dairy Queen stores.

Ar-Tik further contends that:

" * * * Defendant is a promisor in a third party beneficiary contract. It has received the entire consideration for which it made that promise. Whatever transpired in the past between plaintiff and the McCulloughs, whether expressed in terms of motivation, consideration or whatever, which led to the requirement that defendant pay plaintiff is none of defendant's concern.

---

13. See Scapa Dryers, Inc. v. Abney Mills, 269 F.2d 6 (5 Cir. 1959); Prestole Corp. v. Tinnerman Products Inc., 271 F.2d 146 (6 Cir. 1959).

Defendant may not go beyond its own contract."

In other words, Ar-Tik contends that the defendant may not argue that the contract of September 7, 1946, as supplemented, is illegal or unenforceable. We do not dispute this contention. The defendant does not base its defense of patent misuse on the 1946 contract between Ar-Tik and McCullough. It submits that the provision of the contract of October 18, 1949 between the McCulloughs and Messrs. Myer et al., eventually assigned to defendant, which required it to pay for the use of the freezer beyond the patent expiration date is illegal and unenforceable. Indeed, as Ar-Tik points out in its brief, the defendant agreed at the trial that its defense had nothing to do with the consideration which passed between Ar-Tik and the McCulloughs. The 1946 contract is relevant only in so far as it illuminates the provisions of the agreement of October 18, 1949.

A number of other contentions are raised by Ar-Tik. They were examined and found to have no influence on the result reached herein.

No position was argued by either party as to the disposition of the counterclaim. The question raised by it is, in any event, encompassed by the main issue settled in this case. Therefore, it may stand dismissed.

The orders of the District Court of September 30, 1960 and November 21, 1960 granting judgments in favor of Ar-Tik Systems, Inc. against Dairy Queen, Inc. in the sums of $86,169.08 and $32,-424.99, respectively, will be vacated and the case remanded with instructions to enter judgment in favor of Dairy Queen, Inc.

McLAUGHLIN, Circuit Judge (dissenting).

I think that the findings of fact, conclusions of law and the opinion of the district court are completely justified by the record in this case. I would affirm the judgment.